UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **WINDSOR VILLAGE CONDOMINIUM OWNER'S ASSOCIATION,** | * * * | **CIVIL ACTION NO.: 3:21-cv-00468** |
| *Plaintiff,* | * * | **CHIEF JUDGE SHELLY D. DICK** |
| v. | * * | |
| **BERKSHIRE HATHAWAY GUARD INSURANCE COMPANY and AMGUARD INSURANCE COMPANY,** | * * * * | **MAGISTRATE JUDGE SCOTT D. JOHNSON** |
| *Defendants.* | | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

### DEFENDANT AMGUARD INSURANCE COMPANY'S MEMORANDUM IN SUPPORT OF MOTION TO EXCLUDE ADRIAN EUGENE

Defendant AmGUARD Insurance Company ("AmGUARD") submits this memorandum in support of its motion to exclude the testimony and estimate of Adrian Eugene, a public adjuster expert offered by plaintiff Windsor Village Condominium Owner's Association. Eugene was hired on a contingency basis and has an interest in this claim that is squarely violative of Louisiana statutory law governing public adjusters, which should bar him from testifying at trial. What is more, the scope of Eugene's offered testimony should be strictly limited, as he cannot reliably testify as to the vast majority of topics in his Rule 26 disclosure under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Eugene should therefore be disqualified and/or limited from testifying as an expert at trial as set forth below.

### INTRODUCTION

This is a dispute over the cost to repair roofs on nineteen buildings in the Windsor Village condominium damaged by Hurricane Delta in October 2020. Although the roofs needed only nine isolated repairs after Delta at penetration points in the roof, AmGUARD paid Plaintiff $867,946.66

for a roof replacement. But plaintiff did not repair the roofs with that amount,[1] insisting the sum paid by AmGUARD is inadequate to repair the damage because Plaintiff's public adjuster, Adrian Eugene, prepared a $3.7 million estimate for the same work.

Plaintiff hired Eugene following Hurricane Delta (and before submitting an insurance claim to AmGUARD) under a Letter of Representation and Contract (the "Contract") with his company, Victory Public Adjusting. (Exh. A, Contract). Under the Contract, Plaintiff sold its interest in the insurance claim against AmGUARD for an amount set forth in the "Public Adjuster Fee" schedule, which sets forth a straightforward contingency arrangement whereby Eugene is paid dependent upon the amount of the insurance claim. (Exh. A, Contract, at 5). Louisiana statutory law governing public adjusters explicitly forbids such an arrangement. *See* La. R.S. 22:1703(A) (providing that "[a] public adjuster shall not solicit for or enter into any contract or arrangement between an insured and a public adjuster which provides for payment of a fee to the public adjuster which is contingent upon, or calculated as a percentage of, the amount of any claim or claims paid to or on behalf of an insured by the insurer and any such contract shall be against public policy and is null and void.")

Although Eugene attempted tiptoe around this statutory prohibition at his deposition by testifying that he charges plaintiff on an hourly basis, there is no doubt Eugene clearly intends to recoup a contingency fee on this claim: after AmGUARD paid $867,946.66 for the Hurricane Delta damages, Eugene sent Plaintiff an invoice for $85,900 (the exact "flat fee" set forth in the Contract for claims worth between $800,000 and $900,000), and Eugene had no memory (nor records) of how much time he spent on the claim to support his suggestion that this $85,900 invoice

---

[1] Plaintiff used over $600,000 to pay a roofing contractor, Larry Pittmon, to install a temporary roofing system after Hurricane Ida, and the remaining sums were transmitted to Plaintiff's counsel and its public adjuster, Mr. Eugene.

is based upon his work at an $150/hour rate.[2] Eugene's opinion—generated as a result of his illegal Contract and obvious self-interest in exaggerating this claim—should therefore be excluded.

What is more, if Eugene is permitted to testify—which he should not—his opinion should be strictly limited at trial. Plaintiff listed Eugene as a "non-retained" expert and disclosed a vague, broad list of topics to which he would opine at trial, but the scope of Eugene's possible testimony is much narrower. *See* Exh. B, R. Doc. 13, at 2–3. A non-retained expert such as Eugene must still meet Rule 702 and *Daubert* requirements, and his testimony must be limited to his personal observations and involvement in the claim. For these reasons and others, Eugene's testimony at trial should be narrow, as he cannot qualify as an expert to opine (with personal knowledge) regarding many issues he previously disclosed, such as insurance coverage, statutory bad faith, satisfactory proof of loss, and causation, among others.

## LEGAL STANDARD

Federal Rule of Evidence 702 "provides some general standards that the trial court must use to assess the reliability and helpfulness of proffered expert testimony." Fed. R. Evid. 702, Advisory Committee's Note to 2000 amendments. The court must make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592–93 (1993). This gatekeeping function is meant to ensure that "any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Id.* at 589. The focus of the Rule 702 inquiry is "solely on principles and methodology, not on the conclusions that they generate." *Id.* at 595. *Daubert* "provides the

---

[2] As more fully explained below, Eugene's testimony would mean that he spent a preposterous 571 hours on this claim.

analytical framework for determining whether expert testimony is admissible under Rule 702." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 243 (5th Cir. 2002).

Plaintiff, as the proponent of the purported expert testimony, bears the burden of establishing the admissibility of their expert evidence "by a preponderance of proof." *Daubert*, 509 U.S. at 592 n.10. To satisfy its burden, plaintiff must demonstrate "that the expert's findings are based on sound science, and this will require some objective, independent validation of the expert's methodology;" "the expert's bald assurance of validity is not enough.'" *Smelser v. Norfolk S. Ry. Co*., 105 F.3d 299, 303 (6th Cir. 1997) (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 43 F.3d 1311, 1316 (9th Cir. 1995)); *see also Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (*en banc*) (same). Here, Plaintiff cannot meet that burden with respect to Eugene—his illegal contract, lack of personal observations, and failure to take admittedly important steps to analyze causation render his opinion unreliable and inadmissible.

## LAW AND ARGUMENT

**I.   Eugene's Testimony Is Inadmissible Because He Has An Illegal Interest In This Claim That Disqualifies Him and Renders His Testimony Unreliable.**

### a. Eugene's Contract Violates Louisiana Law.

Eugene is a public adjuster, which subjects him to certain rules and regulations in Louisiana's Insurance Code. *See* La. R.S. 22:1691, *et seq.* Specifically, La. R.S. 22:1703—entitled "Public adjuster fees"—states that "[a] public adjuster shall not solicit for or enter into any contract or arrangement between an insured and a public adjuster *which provides for payment of a fee to the public adjuster which is contingent upon, or calculated as a percentage of, the amount of any claim or claims paid to or on behalf of an insured by the insurer and any such contract shall be against public policy and is null and void.*" (emphasis added). The statute could not be clearer: in Louisiana, public adjusters cannot, as a matter of public policy, (i) be paid on a contingency based

upon the amount of the insurance claim, or (ii) enter an agreement that provides for a fee that is calculated as a percentage of the insurance claim. *See id.* Additionally, other provisions in the Insurance Code governing public adjusters prohibit them from having a "direct or indirect financial interest in any aspect of the claim, other than the compensation established in the written contract with the insured." La. R.S. 22:1706(D). What is more, the Rules of Professional Conduct in most jurisdictions, including Louisiana, also prohibit the offering of "an inducement to a witness that is prohibited by law." *See* La. Rules of Professional Conduct R. 3.4(b); *see also* ABA Model Rules of Professional Conduct, R. 3.4(b) cmt. 3 ("The common law rule in most jurisdictions is that . . . it is improper to pay an expert witness a contingent fee.").

There is no question that Eugene's retention and his compensation arrangement for his testimony in this case violate each of these provisions. In Eugene's contract with Plaintiff and accompanying fee schedule, Plaintiff "hereby sells, conveys, and assigns … an interest to the claim against the [] insurance company for the amount set forth below." The "amount" is set forth in a "Public Adjuster Fee" schedule, which details Eugene's "Flat Fee" arrangement that is directly contingent on the amount of the insurance claim:

| Estimated Damages | Flat Fee |
|---|---|
| $200,001 to $250,000 | $22,900 |
| $250,001 to $300,000 | $27,900 |
| $300,001 to $400,000 | $37,900 |
| $400,001 to $500,000 | $47,900 |
| $500,001 to $600,000 | $57,900 |
| $600,001 to $700,000 | $67,900 |
| $700,001 to $800,000 | $75,900 |
| $800,001 to $900,000 | $85,900 |
| $900,001 to $1,000,000 | $95,900 |
| $1,000,001 to $1,250,000 | $114,900 |
| $1,250,001 to $1,500,000 | $124,900 |
| $1,500,000 to $1,750,000 | $149,000 |
| $1,750,001 to $2,000,000 | $169,000 |
| $2,000,001 to $2,250,000 | $199,000 |
| $2,250,001 to $2,500,000 | $219,000 |
| $2,750,001 to $3,000,000 | $269,000 |
| $3,000,001 to $3,500,000 | $299,000 |
| $3,500,001 to $4,000,000 | $349,000 |
| $4,000,001 to $4,500,000 | $399,000 |
| $4,500,001 to $5,000,000 | $449,000 |
| $5,000,001 to $6,000,000 | $499,000 |
| $7,000,001 to $8,000,000 | $699,000 |

(Exh. A, Contract, at 5.)

This fee arrangement is unquestionably violative of La. R.S. 22:1703, as it calculates Eugene's fee as a percentage of the amount of the insurance claim. For example, if the insured recovers $1,000,000—near the amount AmGUARD estimated as the appropriate cost to replace Plaintiff's roofs—Eugene stands to earn $95,900 (or 9.59% contingency). If, on the other hand, Plaintiff recovers the $3,700,000 amount set forth in Eugene's estimate, he stands to earn $349,000 (or 9.97% contingency)—*over $253,000 more*. There is an obvious problem here: Eugene is self-interested in inflating the estimated damages to increase *his own fee* for his work on the claim, and any veneer of Eugene's independence is completely eroded. Louisiana's statutes governing public adjusters do not permit this arrangement, and it precludes Eugene from being offered as an expert in this matter. See, e.g., *Maloney Cinque, L.L.C. v. Pacific Ins. Co., Ltd.*, 2011-0787 (La. App. 4 Cir. 1/25/12), 89 So. 3d 12. In *Maloney*, the court held that a public adjuster's testimony regarding business income damages should have been excluded because he conceded that under his fee

agreement with the insured, the public adjuster stood to earn more if the insured recovered more. *See id.* ("[W]e find the trial court erred and was manifestly erroneous by relying on Mack's testimony. He conceded that the more money the plaintiffs collect in BI, the more money he stands to earn as his fee. Such an arrangement is clearly improper and against public policy for public adjusters." (citing La. R.S. 22:1703)). Indeed, the Office of the Attorney General has issued a specific opinion, No. 06-0282, finding that an agreement nearly identical to Eugene's violates Louisiana's Public Adjuster statute. *See* Exh. C, La. Att'y Gen. Op. No. 06-0282, at 2 (Mar. 23, 2007) ("This office views the proposed fee schedule to be tantamount to a contingency fee because the fee being offered as consideration is directly contingent upon the outcome of the funds recovered.").

Courts in other jurisdictions also agree that experts retained on a contingency basis should be excluded as against public policy. *See Perfect 10, Inc. v. Giganews, Inc.*, 2014 WL 10894452, at *4 (C.D. Cal. Oct. 31, 2014) ("[T]he majority of courts … have held that testimony of expert witnesses whose compensation is contingent upon the outcome of the case must be excluded." (citations and quotations omitted)); *see also Keystone Transportation Sols., LLC v. Nw. Hardwoods, Inc.*, No. 5:18-CV-00039, 2019 WL 1756292, at *3 (W.D. Va. Apr. 19, 2019) (holding that an expert's direct financial incentive in the form of a contingency fee agreement creates a "clear bias" and renders the testimony "confusing and potentially misleading to the jury."). In *Perfect 10*, the court explained:

> While experts are almost universally compensated for their opinion, public policy has long made a distinction between paid experts who have an *indirect incentive* to win the approval of their employers (the client and attorneys) on the one hand, and experts who have a *direct financial stake* in the outcome of the litigation on the other. Public policy tolerates the former category of expert testimony as a necessary evil: although it carries inherent risks of witness bias, those risks can be minimized by the adversarial process and are outweighed by the reality that the modern legal system would collapse without the aid of expert testimony. However, courts of this

>country draw a line where the expert's incentive structure crosses the threshold from an *indirect incentive* to reach a certain conclusion to a *direct financial interest* in doing so. Once the expert obtains a direct financial interest in the outcome of the litigation (whether by his or her status as a party, by contingency fee agreement, or otherwise), any semblance of independence or promise of intellectual rigor that normally adheres to an expert witness is fatally wounded. Under those rare circumstances, the conflict of interest is so great, and raises so many serious questions about the integrity of [the witnesses'] expert testimony, that to admit the conflicted testimony would violate public policy.

*Perfect 10, Inc. v. Giganews, Inc.*, No. CV 11-07098-AB (SHX), 2014 WL 10894452, at *4 (C.D. Cal. Oct. 31, 2014) (internal citations and quotations omitted).

Plaintiff's reliance on Eugene creates exactly the type of conflict of interest that violates public policy: he has a direct financial interest in the outcome of the case (due to his contingency and ownership interest in the claim), and Louisiana statutory law explicitly forbids that arrangement as violative of public policy. *See* La. R.S. 22:1703 (stating that any contract providing for a contingency fee for a public adjuster "shall be against public policy and is null and void.") This Court should follow *Perfect 10* and decisions from other courts around the country that exclude the testimony of experts hired on a contingency basis. *See Straughter v. Raymond*, No. CV 08-2170 CAS, 2011 WL 1789987, at *3 (C.D. Cal. May 9, 2011) ("The Court finds that the better course of action is to exclude the testimony of expert witnesses in civil cases whose compensation is contingent on the outcome of the case."); *J & J Snack Foods, Corp. v. Earthgrains Co.*, 220 F. Supp. 2d 358, 267 n.8 (D.N.J. 2002) ("A contingent fee arrangement with an expert witness would be unethical, and would undermine or destroy the reliability of the survey design and execution."); *Accrued Financial Services, Inc. v. Prime Retail, Inc.*, No. CIV.JFM-99-2573, 2000 WL 976800, at *3 (D. Md. June 19, 2000) ("Financial arrangements that provide incentives for the falsification or exaggeration of testimony threaten the very integrity of the judicial process which depends upon the truthfulness of witnesses.").

### b. Eugene's Testimony Does Not Save His Illegal Contract.

Despite the clear contingency arrangement provided for in the Contract with Windsor Village, Eugene attempted to walk back his illegal contingency fee agreement at deposition by testifying that he actually "owns" the claim and has a "pecuniary interest" in the claim, and Eugene avers that, despite the plain terms of the contract, he is charging an hourly $150/hour rate for his work on the claim, and will collect no more than that hourly rate.[3] But none of Eugene's self-serving attempts to save his illegal contract warrant permitting him to testify.

For one, the contract itself states that his "ownership" interest is in the portion of the claim "for the amount set forth" in the contingency schedule set forth in the contract. (Exh. A, Contract, at 2). Thus, his "ownership" in the claim only reemphasizes the grounds on which his testimony should be excluded: his compensation is dependent upon the outcome of the claim.[4] Further, Eugene's bald testimony that, despite the contract terms, he is actually charging an hourly rate is of no moment—he cannot use testimony to alter the terms of that illegal agreement. *See Condrey v. SunTrust Bank of Georgia*, 429 F.3d 556, 563 (5th Cir. 2005) ("Parol evidence may not be used, however, to vary, alter or add to the terms of a written contract." (citations omitted)). Indeed, Eugene admitted that his hourly rate is not reflected in the actual contract, and that based on the contract's terms, Plaintiff agreed to pay him a contingency fee.[5] Eugene also admitted that the Contract's terms have not been changed in writing.[6] What is more, the public adjuster provisions in the Insurance Code also prohibit Eugene from having any interest in the claim *other* than what

---

[3] Exh. D, Deposition of Eugene, at 89:18–22; 94:11–95:6; 113:6–16.

[4] Exh. D, Deposition of Eugene, at 94:11–95:6 (recognizing Plaintiff sold its ownership interest in the claim to Eugene).

[5] Exh. D, Deposition of Eugene, at 113:6–22.

[6] Exh. D, Deposition of Eugene, at 114:19–25.

is set forth in the four corners of that contract. La. R.S. 22:1706(D) (forbidding a public adjuster from having any "direct or indirect financial interest in any aspect of the claim, other than the compensation established in the written contract with the insured.") Therefore, even if Eugene's testimony could alter the terms of the Contract (which it cannot), Louisiana law also precludes Eugene from relying on any such altered terms, as the interest provided for in the written Contract—which is illegal—controls.

Second, Eugene's testimony regarding this purported hourly rate belie reality, and are wildly unreliable. After AmGUARD paid Plaintiff $867,946.66, Eugene sent Plaintiff an invoice for $85,900—the exact amount of the contingency "flat fee" that corresponds with claims worth between $800,000 and $900,000 as set forth in Eugene's Contract. (Exh. E, 8/2/21 Invoice). Eugene has also been paid approximately $40,000 on this invoice, and expects to be paid the remainder.[7] Although Eugene stated that this invoice was for hourly work, his two-page invoice does provide any details at all regarding the tasks he performed, the amount of time he spent on each task, or the dates he performed those tasks—the invoice contains only general overview of his work on the claim, and requests a flat sum. (Exh. E, 8/2/21 Invoice). Eugene's purported $150/hour rate is not on the invoice, either. Eugene did not produce any other support for this invoice in response to a subpoena, and he admitted he did not know how many hours he spent on the claim.[8]

What is more, any suggestion by Eugene that his $85,900 invoice was generated by hourly work is preposterous: Eugene testified that he would not charge Windsor Village more than $150/hour for the number of hours worked, but it would take him over ***572 hours*** to bill $85,900

---

[7]   Exh. D, Deposition of Eugene, 98:10–16.

[8]   Exh. D, Deposition of Eugene, at 108:18–109:13.

at that rate.[9] If Eugene worked 8-hour days, and devoted all of his time to this claim, accepting Eugene's testimony would mean that he spent over **71 days** working on this claim. That figure is outrageous, and reveals exactly why his testimony should be excluded: he is attempting to escape the illegal terms of his contract through an *ex post facto* recreation of that document that defies reality, which prevents AmGUARD (and the Court) from evaluating exactly how much (and on what basis) Eugene stands to earn on this claim. Eugene's maneuvering also makes it abundantly clear that Eugene is attempting to earn the benefit of his contingency fee agreement (by charging Windsor Village a high sum on that basis), without suffering the consequences (having the contract found void as against public policy). The uncertainty and unreliability concerning Eugene's compensation arrangement, coupled with the illegal terms of his contract, warrant precluding him from testifying.

## II. Alternatively, Eugene's Testimony Should Be Strictly Limited.

If Eugene is permitted to opine as a non-retained expert despite his illegal interest in this claim, the Court should strictly limit Eugene's offered testimony. As a non-retained expert, Rule 26(a)(2)(C) required Plaintiff to disclose "the subject matter on which the witness is expected to present evidence" *and* "a summary of the facts and opinions to which the witness is expected to testify." Fed. R. Civ. P. 26(a)(2)(C). Plaintiff did not comply with this Rule—its disclosure is vague and lacks any details whatsoever regarding Eugene's actual opinions or the facts to which he will testify; Plaintiff's disclosure states that Eugene will broadly testify as to "the effect of the subject storm in this matter . . . , his estimate for necessary repairs . . . , the manner in which Defendant handled and investigated Plaintiff's claim . . . , his inspections of the property, and the

---

[9] Exh. D, Deposition of Eugene, at 115:25–116:2.

structural damage . . . that resulted from the storm." (Exh. B, R. Doc. 13, at 3.)  At deposition, Eugene also disclosed that he would testify as to insurance coverage.[10]

Despite Plaintiff's broad disclosure—which prevents AmGUARD from meaningfully ascertaining Eugene's actual opinions and the facts underlying same—Eugene's testimony as a non-retained expert is limited to his "opinions formed as a result of his knowledge of the case gained through direct observation." *MGMTL, LLC v. Strategic Technology*, No. 20-2138-WBV-MBN, 2022 WL 474161, at *4 (E.D. La. Feb. 16, 2022) (citations omitted).  Eugene must also satisfy Rule 702's requirements on reliability, regardless of whether he is listed as a retained or non-retained expert. *Id.* at *5.  Because Eugene did not submit a report disclosing his opinions, he cannot testify "about broader issues beyond [his] personal involvement." *Id.*  This limitation, coupled with hornbook law regarding the scope of public adjuster's testimony, show that Eugene's cannot opine on the following topics:

### *Insurance Coverage, Bad Faith, Claims Handling, and Satisfactory Proof of Loss*

As an initial matter, Eugene cannot opine on issues of insurance coverage, policy interpretation, statutory interpretation, bad faith, or satisfactory proof of loss. *See Eaux Holdings LLC v. Scottsdale Ins. Co.*, No. 2:20-CV-01582, 2021 WL 5986874, at *2 (W.D. La. Oct. 12, 2021) (limiting testimony of non-retained expert public adjuster on those topics).  Indeed, and as noted recently by the court in *Eaux Holdings*, the statutes governing public adjusters prevent them from rendering legal advice regarding policy provisions or coverage issues. *See* La. R.S. 22:1706(H)(7)–(8) (providing that "[a] public adjuster shall not render legal advice to the insured, including but not limited to legal advice regarding the policy provisions or coverage issues," and that a "public adjuster shall not engage in the unauthorized practice of law as defined in R.S. 37:212 and 213.")

---

[10]   Exh. D, Deposition of Eugene, at 11:1–3.

What is more, and despite Eugene's overly broad Rule 26 disclosure, he did no work to evaluate the policy for coverage on this claim, and therefore he cannot testify on any coverage issues.[11] This Court should forbid Eugene from testifying on these topics under *Eaux Holdings*.

Furthermore, Eugene specifically disclaimed offering any opinion regarding claims handling in this case.[12] Without an opinion, Eugene cannot offer any testimony on that issue—he did not disclose it in his Rule 26 submission, he did not produce any facts or data on which he would rely for that opinion, and he advised that he would not offer any such opinions at his deposition. Eugene should not be permitted to offer an opinion on claims handling.

### *Causation and Comparison of Delta vs. Ida Damages*

Eugene should likewise be barred from offering any opinion regarding the cause of the damages he observed, and any opinion regarding the extent of damage caused by Hurricanes Delta versus Ida. Even though a non-retained expert's testimony is limited to their "personal observations," they nevertheless must satisfy the Rule 702 and *Daubert* standards to offer opinions at trial. These requirements prevent Eugene from offering any causation opinion or analysis of the scope of damage caused by Delta versus Ida.

With respect to causation, Eugene has no personal knowledge (and did no investigation or analysis) regarding the condition of Plaintiff's roofs prior to Hurricane Delta. Eugene did not communicate with Plaintiff regarding any pre-existing damage or leaks in the roofs, and Eugene was not supplied with any information regarding those issues.[13] However, Eugene also testified that it would be important to have such information, he would have examined any pre-existing

---

[11]    Exh. D, Deposition of Eugene, at 138:16–139:7.

[12]    Exh. D, Deposition of Eugene, at 13:21-23.

[13]    Exh. D, Deposition of Eugene, at 81:6–10.

leaks/damaged areas in preparing his estimate, *and it would have impacted his opinion regarding the cause, scope and cost of repairs*.[14] What is more, Eugene did not inspect the property after Hurricane Ida, so he did not "personally observe" any characteristics that would allow him to opine on the scope of damages caused by Ida as compared to Delta. Simply put, Eugene lacks the requisite level of data and "personal observations" to allow him to opine on causation or any comparison of the two hurricanes with the degree of reliability demanded by Rule 702 and *Daubert. See, e.g., JRL Enterprises, Inc. v. Procorp Associates, Inc.*, No., Civ.A. 01-2893, 2003 WL 21284020, at *8 (E.D. La. June 3, 2003) (excluding purported expert's opinions because expert "failed to conduct any independent research to determine the reliability of his assumptions"); *E.E.O.C. v. Freeman*, 778 F.3d 463, 469–70 (4th Cir. 2015) (Agee, J., concurring) (noting that "courts have consistently excluded expert testimony that 'cherry-picks' relevant data" because "'[c]herry-picking' data is essentially the converse of omitting it: just as omitting data might distort the result by overlooking unfavorable data, cherry-picking data produces a misleadingly favorable result by looking only to 'good' outcomes" (collecting cases)).

### *Reasonable or Appropriate Cost to Repair and Replace the Roofs*

Lastly, Eugene should not be permitted to testify regarding what constitutes a contractor's reasonable or appropriate cost to repair and replace the roofs. While Eugene did his own work to prepare his $3.7 million estimate, and he presented it to *one contractor* (Larry Pittmon) who agreed to perform the work at that price, Eugene did not take any steps to evaluate, test or examine whether his estimate reflected a reasonable or appropriate price in the open market. Eugene did not submit a bid package or communicate with any other contractor on pricing,[15] and thus his "personal

---

[14]   Exh. D, Deposition of Eugene, at 81:6–82:17.

[15]   Exh. D, Deposition of Eugene, at 56:4–6.

observations" limit him to testifying only about the sum Larry Pittmon accepted for the work. Eugene cannot opine on broader issues such as an industry-wide acceptable price to perform the work for this claim, as those issues fall outside his firsthand knowledge as a non-retained expert. *See Eaux Holdings LLC v. Scottsdale Ins. Co.*, No. 2:20-CV-01582, 2021 WL 5986874, at *2 (W.D. La. Oct. 12, 2021).

## **CONCLUSION**

Eugene's opinion is tainted by an illegal compensation arrangement that is expressly forbidden under Louisiana law, and therefore public policy requires precluding his testimony at trial. None of Eugene's testimony can alter the terms of that contract, either, and his lack of personal observations and reliable methods prevent him from offering opinions regarding many of the topics listed in his disclosure. AmGUARD therefore respectfully requests that its motion be granted, and that Eugene's testimony be excluded and/or limited as set forth herein.

Respectfully Submitted,

/s/John W. Joyce
John W. Joyce, 27525
Laurence D. LeSueur, Jr., 35206
Lance W. Waters, 37351
BARRASSO USDIN KUPPERMAN
 FREEMAN & SARVER, L.L.C.
909 Poydras Street, Suite 2350
New Orleans, Louisiana 70112
Telephone: 504-589-9700
Facsimile: 504-589-9701
jjoyce@barrassousdin.com
llesueur@barrassousdin.com
lwaters@barrassousdin.com

*Attorneys for AmGUARD Insurance Company*