# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **WINDSOR VILLAGE CONDOMINIUM OWNER'S ASSOCIATION** <br> *Plaintiff* | § <br> § <br> § | **CIVIL ACTION NO. 3:21-cv-00468** |
| **v.** | § <br> § <br> § | **JUDGE BRIAN A. JACKSON** |
| **AMGUARD INSURANCE COMPANY** <br> *Defendant* | § <br> § <br> § <br> § | **MAG. JUDGE SCOTT D. JOHNSON** |

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION TO ENFORCE THE APPRAISAL AWARD

NOW INTO COURT, comes Plaintiff, Windsor Village Condominium Owner's Association ("WVCOA"), who files this Memorandum in Support of Plaintiff's Motion to Enforce the Appraisal Award, and would respectfully show:

### SUMMARY OF THE MOTION

Windsor Village Condominium Owner's Association seeks to enforce and confirm the binding appraisal award for property damage caused by Hurricanes Delta and Ida, issued under the insurance policies and the Appraisal Agreement and Protocol. The appraisal process was completed by qualified and unbiased individuals. AmGUARD has failed to honor its contractual obligations, refusing to pay the award and instead launching baseless attacks against WVCOA's appraiser and the mutually agreed umpire, Joel Moore.

Louisiana law is well decided as to when an appraisal award should be confirmed. Binding appraisal awards are enforceable absent a showing that the appraisal failed to comply with the express terms of the contract or evidence that the panel members were not competent (qualified to

appraise the property) or disinterested (without any personal financial stake in the outcome of the appraisal award, beyond their appraisal fee).[1] Every reasonable intendment and presumption is in favor of an award of appraisers selected to determine the value of property lost.[2] The burden of showing that an appraisal award should not be confirmed falls on the party who challenges it.[3]

AmGUARD has filed a competing Motion to Vacate the Appraisal Award in an attempt to distract the Court from the relevant facts. For over three years, AmGUARD has disregarded the truth. It falsely claimed exclusions apply to WVCOA's claims, contradicted by its own corporate representative's testimony. AmGUARD alleged WVCOA delayed repairs, yet admitted it would not be possible to repair the roof damage from Hurricane Delta before the passing of Hurricane Ida because of how late AmGUARD paid the claim. Additionally, AmGUARD accused WVCOA of withholding information about prior repairs, but its experts found no evidence of pre-existing damage contributing to the loss. WVCOA expects more of the same false rhetoric in AmGUARD's motion to vacate.

The facts show that the agreed upon appraisal process was completed and that if anyone acted out of line, it was AmGUARD and its appraiser. The appraisal process accommodated the significant delay of Dan Kessinger, AmGUARD's appraiser, in providing a position to the panel. The facts show Mr. Kessinger's position was riddled with falsehoods, omitted agreed upon damages, and contained deliberately low construction bids to try and cheat the appraisal process. All of these things factored into Mr. Kessinger's position having little to no credibility. On March 21, 2024, WVCO's appraiser and the umpire signed an appraisal award in accordance with the

---

[1] *See* La. R.S. § 22:1311; *see also St. Charles Parish Hosp. Serv. Dist. No. 1 v. United Fire & Cas. Co.,* 81 F. Supp. 2d 748 (E.D.La. 2010); *Prien Props., LLC v. Allstate Ins. Co.,* No. 07–845, 2008 WL 1733591, at *2 (W.D.La. Apr. 14, 2008); *Branch v. Springfield Fire & Marine Ins. Co.,* 198 La. 720, 4 So.2d 806 (1941).
[2] *St. Charles Par. Hosp. Serv. Dist. No. 1 v. United Fire & Cas. Co.,* 681 F. Supp. 2d 748, 760 (E.D. La. 2010).
[3] *Cole v. Garrison Prop. & Cas. Ins.,* 2023 BL 383430, at *3 (M.D. La. Oct. 26, 2023).

policies and the Appraisal Agreement and Protocol, setting forth the amount of loss pertaining to Hurricane Delta and Hurricane Ida.

Given the evidence, the Court should confirm the appraisal award. If any correctable issue arises, the panel should be directed to address it and resubmit the award for confirmation.

## FACTUAL BACKGROUND

Located at 4848 Windsor Village Dr, Baton Rouge, Louisiana, 70817 is the Windsor Village community (the "Property").[4] The Property contains 19 residential buildings containing 106 individual units as well as a community center building.[5]

On or about November 2, 2019, AmGUARD sold an insurance policy to WVCOA, with a policy period from November 2, 2019, through November 2, 2020 ("Policy 1").[6] Policy 1 expressly provided coverage for damage caused by wind.[7] Shortly after Policy 1 was procured, AmGUARD sent George Harris of Sedgwick to inspect the Property.[8] Mr. Harris performed a visual inspection of the exterior of the Property, including the roofs.[9] Mr. Harris' report did not identify any issues with the Property and stated the roofs were in average condition.[10]

On or around October 9, 2020, Hurricane Delta made landfall on the Louisiana coast bringing sustained winds of 100 mph.[11] On November 2, 2020, Policy 1 ended but renewed as Policy No. WIBP177732 ("Policy 2").[12] WVCOA timely reported the loss to AmGUARD who

---

[4] Plaintiff's First Amended Complaint [Doc. 87, at ¶6].
[5] *Id.*
[6] *Exhibit 1*, Policy No. WIBP086199.
[7] *Id.* at AMGUARD 0001118 – 1123.
[8] *Exhibit 2*, November 19, 2019, Report.
[9] *Id.*
[10] *Id.*
[11] https://en.wikipedia.org/wiki/Hurricane_Delta
[12] *Exhibit 3*, Policy No. WIBP177732.

assigned claim numbers WIBP086199-001-001-001 through WIBP086199-020-020-020 ("Claim 1").[13]

AmGUARD retained the services of Engle Martin & Associates ("Engle Martin") to provide insurance adjusting services.[14] On January 21, 2021, sixty-four days after AmGUARD received notice of the loss, Kevin Collet of Engle Martin performed the first inspection of the Property for Claim 1.[15] Mr. Collet's inspection of the roofs of the Property consisted of "a walk on inspection of all 20 buildings roofing systems" which revealed "wind damage on all directional slopes."[16] Mr. Collet requested authority to issue payment to WVCOA in the amount of $930,027.53 on February 4, 2021.[17]

On February 10, 2021, Aubrey Smith, the lead desk adjuster on Claim 1 for AmGUARD, provided Mr. Collet's report and estimate to the "estimate review team" consisting of two men named Tony Cariot and Corey Massaro.[18] March 4, 2021, Mr. Cariot completed an estimate for Claim 1 which equaled $1,149,457.53 in replacement cost value and $867,946.66 in actual cash value.[19] AmGUARD's corporate representative has testified that as of March 4, 2021, AmGUARD did not have any disagreement with Mr. Cariot's estimate.[20] AmGUARD admits no exclusions apply to Claim 1 under Policy 1.[21]

Despite no exclusions applying, and the amount of the estimate being undisputed, AmGUARD did not pay the undisputed amount under Claim 1 of $867,946.66 to WVCOA until

---

[13] *Exhibit 4*, Claim 1 Acknowledgement.
[14] *Exhibit 5*, Engle Martin Immediate Advice Report dated January 22, 2021, AmGUARD 000433-000437.
[15] *Id.*
[16] *Id.*
[17] *Exhibit 6*, AmGUARD Claim File – Claim 1 at AmGUARD 000009
[18] *Id.*, at AmGUARD 000008; *Exhibit 7*, Deposition of Tony Cariot at P. 20, Lines 7-16; P. 46, Line 20 through P. 47, Line 6.
[19] *Exhibit 8*, March 4, 2021, Estimate.
[20] *Exhibit 9*, Deposition Testimony of Mark Fontanella, P. 84, Lines 22 – 25.
[21] *Id.* at P. 117, Line 16-19; Line 23.

July 14, 2021, which is nearly six months after AmGUARD first inspected the loss.[22] Between March 4, 2021, and July 14, 2021, AmGUARD admits it conducted no investigation of the claim, to warrant such a delay in paying the undisputed amount of Claim 1.[23] On August 16, 2021, WVCOA filed suit against AmGUARD for breach of contract and violations of La. R.S. §22:1973 and §22:1892.

On or around August 29, 2021, Hurricane Ida made landfall on the Louisiana coast, with maximum sustained winds of 150 mph.[24] Hurricane Ida caused additional damage to the Property.[25]

Immediately, WVCOA complied with its duty to mitigate further damages by paying its contractor to place temporary synthetic felt on the roof.[26] Larry Pittmon, WVCOA's contractor and a fellow unit owner, installed a double layer of felt that would last significantly longer than temporary tarping.[27] The total cost of this job was $606,924.00, which WVCOA paid in full.[28]

WVCOA, through the undersigned counsel, submitted an additional claim and provided AmGUARD with a timely First Notice of Loss pursuant to Policy 2.[29] AmGUARD did not even acknowledge the loss and assign claim numbers until December 16, 2021, more than 60 days later.[30] Claim Nos. WIBP086199-001-001-001 through WIBP086199-020-020-020 ("Claim 2") were assigned for WVCOA's Hurricane Ida claim.[31]

---

[22] *Exhibit 10*, AmGUARD Checks, at WINDSOR VILLAGE 001692 – 001711.
[23] *Exhibit 9*, Deposition of Mark Fontanella at P. 114, Line 22 – P. 115, Line 12.
[24] Catastrophic Hurricane Ida Strikes Southeast Louisiana August 29, 2021, NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION, https://www.weather.gov/lix/hurricaneida2021.
[25] [Doc 87, at ¶ 25].
[26] *Exhibit 11*, September 10, 2021, Summit Construction & Exteriors Invoice.
[27] *Id*.
[28] *Id*.
[29] *Exhibit 12*, WVCOA Notice of Loss.
[30] *Exhibit 13*, AmGUARD Claim Acknowledgements, AmGUARD 001510 – 001586.
[31] *Id*.

AmGUARD assigned Pilot, an independent adjusting company, to inspect the Property for Claim 2. Jonathan Brantley of Pilot inspected the Properties on or around January 11, 2022.[32] AmGUARD did not review the Pilot Report until February 4, 2022, and despite the report identifying that WVCOA had paid more than $600,000 in mitigation costs, AmGUARD took no action at all on Claim 2 for more than two years.[33] The entire collection of notes entered into AmGUARD's claim file system for Claim 2 amounted to two pages, with five total note entries.[34]

The Parties continued to litigate WVCOA's causes of action on Claim 1. Despite AmGUARD raising numerous affirmative defenses claiming certain exclusions applied, AmGUARD's corporate representative testified under oath that no exclusions applied.[35] Despite suggesting that WVCOA "held off" on repairs, AmGUARD and its retained experts admit it would not have been possible to replace the roofs on all twenty buildings before Hurricane Ida caused more damage.[36]

Following the resetting of the trial for Claim 1, on June 14, 2023, the Parties agreed to participate in the appraisal process for Claims 1 and 2.[37] In addition to relying on the language in the Policies, the Parties entered into a specific Appraisal Agreement and Protocol that made the appraisal award binding on WVCOA and AmGUARD. [38]

On June 21, 2023, WVCOA appointed Luke Irwin to act as its appraiser and notified AmGUARD.[39] AmGUARD named its appraiser, Dan Kessinger, on August 1, 2023, forty-one

---

[32] *Exhibit 14*, Pilot Communications and Report.
[33] Exhibit 15, AmGUARD Claim File – Claim 2. It is important to note that AmGUARD took no action at all on Claim 2 and made no payments towards Claim 2 until April 12, 2024.
[34] *Id.*
[35] *Exhibit 09*, Deposition Testimony of Mark Fontanella, P. 117, Line 16-19; Line 23; (Doc. 7).
[36] *Id.*, at P. 103, Lines 9 – 24; *See also Exhibit 16*, Deposition Testimony of Jeffrey Button, P. 85, Line 16 – P. 86, Line 5; *See also* (Doc. 60, Section G).
[37] *Exhibit 17*, Emails Between Counsel dated June 14, 2023, through June 21, 2023.
[38] *Exhibit 18*, Appraisal Agreement and Protocol.
[39] *Exhibit 17*, Emails Between Counsel dated June 14, 2023, through June 21, 2023.

(41) days later.[40] On August 7, 2023, Mr. Irwin sent Mr. Kessinger a list of potential umpires.[41] On or about August 7, 2023, through August 9, 2023, Mr. Irwin and his team inspected the Property. in full, taking thousands of photographs, measurements, and readings.[42]

On August 31, 2023, Mr. Irwin and Mr. Kessinger signed an Insurance Appraisal Panel Agreement which memorialized that Mr. Irwin and Mr. Kessinger had been designated as appraisers by the respective parties and that they had agreed to use Joel H. Moore as the umpire.[43] The Insurance Appraisal Panel Agreement also provided that Mr. Irwin and Mr. Kessinger agreed Mr. Moore was competent and impartial.[44]

Mr. Kessinger did not complete an inspection of the Property until November 16, 2023.[45] Mr. Kessinger walked the entirety of the property but did not physically get on the roofs.[46] Mr. Kessinger testified he completed an estimate for the roofs following his November 16, 2023, inspection.[47] To date, neither Mr. Kessinger nor AmGUARD has produced this estimate.

On February 1, 2024, Mr. Irwin provided Mr. Kessinger a thumb drive containing a number of documents, including an estimate, representing his position as to the amount of loss and delineating between the losses caused by Hurricane Delta and Hurricane Ida.[48] Via email on the same day, Mr. Irwin asked Mr. Kessinger and Mr. Moore if they were available for a joint inspection occurring on February 8th or 9th.[49] Mr. Irwin also indicated that the Parties wanted the

---

[40] *Exhibit 19*, Email dated August 1, 2023.
[41] *Exhibit 20*, Appraisal Panel Emails.
[42] [Doc. 87, ¶ 32.]
[43] *Exhibit 21*, Appraisal Panel Agreement.
[44] *Id*.
[45] *Exhibit 22*, Deposition of Dan Kessinger, at P. 43, Lines 3 – P. 45, Line 8.
[46] *Id*.
[47] *Id*. at P. 47, Lines 1-12.
[48] *Exhibit 20,* at Kessinger 009062; *See also Exhibit 23*, Luke Irwin's Appraisal Position and Estimate.
[49] *Exhibit 20* at Kessinger 009061.

appraisal process completed by March of 2024.[50] Mr. Kessinger received the thumb drive sent by

Mr. Irwin and reviewed Mr. Irwin's position prior to the appraisal panel joint inspection.[51]

The appraisal panel performed a joint inspection on February 21, 2024.[52] The panel

inspected the property using a sampling method of the buildings and walked the entire exterior of

the property.[53] According to both Mr. Moore and Mr. Irwin, Mr. Kessinger was in agreement with

the scope of Mr. Irwin's position outside of an obvious number transposition error on the pool

estimate.[54] This included that the roofs required replacement, code upgrades, fencing damage,

cladding and gutters, and interior damages.[55]

On February 23, 2024, Mr. Irwin sent an email to the panel that memorialized the joint

panel inspection.[56] Mr. Irwin specifically mentions correcting a clerical error on the pool valuation,

and that Mr. Kessinger requested to "inspect the fence, two interiors, damages to the exterior

claddings and a few gutters, as well as access to unit 12's attic, which was all facilitated and

completed to the panel's satisfaction."[57] Mr. Irwin also notified the panel that to comply with the

Appraisal Agreement and Protocol and the Court's March 12, 2024 deadline, all documents needed

to be turned in by February 27, 2024.[58]

---

[50] *Id.*
[51] *Exhibit 22*, Deposition of Dan Kessinger at 67, Lines 11 – 16.
[52] *Exhibit 24*, Deposition of Joel Moore at P. 100, Line 22 – P. 101, Line 8; *Exhibit 20* at Kessinger 009057 – 009059.
[53] *Exhibit 24*, Deposition of Joel Moore at P. 106, Line 22 – P. 107, Line 13.
[54] *Id.* at P. 144, Line 8 – P. 146, Line 3; *Exhibit 25*, Deposition of Luke Irwin, at P. 70, Line 21 – P. 71, Line 11.
[55] *Id.*
[56] *Exhibit 20*, at Kessinger 009057 – 009059.
[57] *Id.*
[58] *Id.*

Mr. Kessinger then requested to reinspect the Property for a third time for multiple days, and that he would complete his position by March 4, 2024.[59] Mr. Kessinger was again provided access and inspected the Property on February 27 – 29, 2024.[60]

On February 29, 2024, counsel for AmGUARD emailed Mr. Irwin and Mr. Kessinger to notify them that the Parties had agreed to allow the panel until March 19, 2024, to issue an award.[61] All parties and the panel agreed to modify the Appraisal Agreement and Protocol to allow each respective appraiser's position to be considered by the umpire without restriction.[62]

On March 11, 2024, Mr. Moore sent an email to the panel stating he was "greatly concerned about receiving Mr. Kessinger's position in time to properly review."[63] A few hours later, Mr. Kessinger replied that he had completed his position and would provide it to Mr. Moore later that day.[64] On March 15, 2024, Mr. Moore acknowledged receipt of the thumb drive from Mr. Kessinger containing his position and that he would "spend today and the weekend reviewing all the information."[65]

Mr. Moore testified, when he first reviewed Mr. Kessinger's estimate he immediately noticed that Mr. Kessinger had omitted a number of items he had verbally agreed to during the joint panel inspection, including the roof decking, tarping, fencing, cladding and gutters.[66] Additionally, Mr. Kessinger's estimate did not delineate between damages caused by Hurricane Delta and Damages Caused by Hurricane Ida, to which Kessinger admits.[67]

---

[59] *Id*. at Kessinger 009055.
[60] *Exhibit 26*, Dan Kessinger Appraisal Position and Estimate.
[61] *Exhibit 35*, Emails dated February 29, 2024, through March 12, 2024.
[62] *Id*.
[63] *Exhibit 20*, Appraisal Panel Emails at Kessinger 009050.
[64] *Id*.
[65] *Id*. at Kessinger 009045.
[66] *Exhibit 24*, Deposition of Joel Moore at P. 144, Line 8 – P. 146, Line 21.
[67] *Exhibit 22*, Deposition of Dan Kessinger P. 74, line 8 – P. 75, Line 4.

In reviewing Mr. Kessinger's Position, he claimed that his opinion was "supported by two (2) live bids for a scope of work that includes removing and replacing the laminate shingle roofs" and further that "Irwin's appraisal position does not acknowledge any live bids."[68]. Mr. Kessinger has since testified that he did not obtain two live bids because, one of the "bids", from a company called Sunrise Roofing and Construction, was not a realistic proposal.[69] The estimate from Sunrise Roofing and Construction which Mr. Kessinger testified was too low, was more than $600,000 higher than AmGUARD's only estimate it created for Claim 1.[70]

Mr. Kessinger's position included what he described as a "live bid" from another roofing company called Coleman Roofing and Construction.[71] Mr. Kessinger's employee, Dan Wilkinson, communicated with David Lamonte of Coleman.[72] Mr. Wilkinson told Mr. Lamonte that Coleman would not be receiving the job and that he wanted an estimate using the scope Mr. Wilkinson provided.[73] Coleman was never told about the issues with the decking and framing that both Mr. Moore and Irwin have testified Mr. Kessinger agreed to.[74] Coleman also was not provided the opportunity to inspect the Property like Sunrise.[75] On March 1, 2024, Coleman completed an estimate based on Mr. Kessinger's provided scope and measurements for the roofs, without decking or framing, for $2,138,500.00.[76]

Upon reading Mr. Kessinger's position, Mr. Irwin contacted Chris Yancey, the owner and operator of Coleman.[77] Mr. Yancey explained to Mr. Irwin that Coleman only provided a bid based

---

[68] *Exhibit* 26, Dan Kessinger Appraisal Position and Estimate at Windsor Village 002364
[69] *Exhibit 22*, Deposition of Dan Kessinger at P. 80, Line 3 – 22.
[70] *Exhibit 8.*
[71] *Exhibit* 26, Dan Kessinger Appraisal Position and Estimate at Windsor Village 002369.
[72] *Exhibit 27*, Coleman Communications and Purported Bid.
[73] *Exhibit 28,* Affidavit of David Lamonte.
[74] *Id*. *See also Exhibit 24,* Deposition of Joel Moore at P. 144, Line 8 – P. 146, Line 3; *Exhibit 25*, Deposition of Luke Irwin, at P. 70, Line 21 – P. 71, Line 11
[75] *Exhibit 28,* Affidavit of David Lamonte; *Exhibit 29* Affidavit of Chris Yancey.
[76] *Exhibit 27*, Coleman Communications and Purported Bid.
[77] *Exhibit 29* Affidavit of Chris Yancey, ¶ 7.

on the information given to him and that if a true bid was required Coleman would need more information and access to the property.[78] Upon realizing that Meridian wanted to claim that the Coleman estimate was a live bid, that another roofer (Summit Construction) already represented WVCOA and that an appraisal process was ongoing relating to the Property, Mr. Yancey sent an email to Mr. Irwin clarifying Coleman was asked to provide a low estimate based on limited information.[79] Mr. Yancey himself is an appraiser and umpire, in addition to being a general contractor, and in his opinion, Mr. Wilkinson and Meridian were "attempting to undermine and cheat the appraisal panel."[80]Mr. Kessinger never sent in a correction to the panel regarding the "live bids" he claimed to have obtained.[81]

On March 18, 2024, Mr. Moore submitted a proposed appraisal award via email to the panel.[82] On March 19, 2024, Mr. Moore sent the panel an email stating "As umpire, I believe we have given this file ample review. I too reviewed all the pertinent data provided and am certain we have a viable product for the attorneys to review and consider. Thank you for the opportunity to help with this appraisal."[83]

On March 20, 2024 at 2:31 p.m., Mr. Kessinger emailed the panel and notified them of an error in the transposition of number for the appraisal award and the final appraisal estimate.[84] Less than an hour later, at 3:22 p.m., and before the corrected award was signed, Mr. Kessinger emailed counsel for AmGUARD a link to a report from the Louisiana Legislator Auditor regarding Joel Moore.[85] When asked why he sent this to AmGUARD's lawyers, Mr. Kessinger testified "It was

---

[78] *Id.*
[79] *Exhibit 30*, March 15, 2024, Email from Chris Yancey.
[80] *Exhibit 29* Affidavit of Chris Yancey, ¶ 8.
[81] *Id.* at P. 76, Line 12 - P. 77, Line 1.
[82] *Exhibit 20*, Appraisal Panel Emails at Kessinger 009043.
[83] *Id.* at Kessinger 009039.
[84] *Id.* at Kessinger 009038.
[85] Exhibit 31, March 20, 2024, email from Dan Kessinger.

after we felt that the appraisal award had gone south. And so then I did some additional investigation online in the relationship of Luke Irwin and Joel Moore."[86]

The panel agreed with Mr. Kessinger regarding an error on the final award and estimate and Mr. Moore made the correction and resubmitted the award, which Mr. Irwin and Mr. Moore signed.[87] Pursuant to the Appraisal Agreement and Protocol, the final appraisal award specifically itemized the costs associated with each building, each hurricane, and any applicable code upgrades per building.[88]

On March 21, 2024, Mr. Kessinger emailed the panel stating that the final award contained "mistakes that artificially inflate the award."[89] A few minutes later, Mr. Irwin responded to Mr. Kessinger's email and asked Mr. Kessinger to specifically point out the mistakes in detail so the panel could reopen and correct if necessary.[90] Mr. Kessinger never responded to the panel identifying any specific mistake.[91]

Mr. Moore did not definitively agree with either party in issuing an award. Mr. Irwin's estimate was $11,430,388.79 in RCV and $11,237,160.09 in ACV, with the clerical error on the pool house which was fixed.[92] Mr. Moore removed at least 120 line-items and lowered the overall estimate by $1,918,222.82 in RCV and $1,912,130.97 in ACV.[93] Policy 1 carries a 1% deductible per building, a $10,000 limit on ordinance and law coverage.[94] Policy 1 carries a 2% deductible per building, and a $10,000 limit on ordinance and law coverage.[95]

---

[86] *Exhibit 22*, Deposition of Dan Kessinger at P. 159, Line 11 – P. 160, Line 1.
[87] *Id*. at Kessinger 009036; *Exhibit 32*, Final Appraisal Award.
[88] *Exhibit 32*, Final Appraisal Award; *Exhibit 33* Final Appraisal Award Valuation.
[89] *Exhibit 20*, Appraisal Panel Emails at Umpire Moore 2020-2021 (Page 1 and 2 of the .pdf).
[90] *Id*.
[91] *Exhibit 22*, Deposition of Dan Kessinger at P. 97, Line 8 – 22; P. 99, Line 7 – P. 100, Line 8.
[92] *Exhibit 23,* Luke Irwin's Appraisal Position and Estimate.
[93] *Id*.; *Exhibit 33*, Final Appraisal Award Valuation.
[94] *Id*. *Exhibit 1*, at AmGUARD 0001034 – 0001053.
[95] *Exhibit 3*, at AmGUARD 001385 – 001404.

On April 11, 2024, counsel for AmGUARD sent a letter to counsel for WVCOA that AmGUARD would not be paying the binding award, asserting various accusations against Mr. Irwin and Mr. Moore.[96] AmGUARD's counsel further stated that "AmGUARD is tendering to Windsor Village $1,036,242.32 within 30 days of AmGUARD's receipt of its appraisers findings which is an amount [sic] reflects the Actual Cash Value of repairs estimated by AmGUARD's appraiser, Dan Kessinger, that are covered under the Policy for damages caused by Hurricanes Delta and Ida, less the applicable deductible for Hurricane Ida, less prior payments, and less recoverable depreciation.[97] No explanation was provided for how Claims 1 and 2 were being paid, what exclusions AmGUARD asserted applied, or what policy provisions limited amounts owed.

Although AmGUARD appears to claim it is paying for damages from Hurricane Ida and Hurricane Delta based on Mr. Kessinger's estimate, Mr. Kessinger's estimate does not contain any delineation of damages for each hurricane, and Mr. Kessinger testified he attributed all damage to Hurricane Delta.[98]

## LAW AND ARGUMENT

Louisiana law is well decided as to when an appraisal award should be confirmed. Appraisal clauses are enforceable under Louisiana law.[99] An appraisal award issued under an insurance policy is binding if the appraisers have performed the duties required of them by the policy and/or the contract between the parties.[100] Appraisal provisions are also strictly construed.[101]

---

[96] *Exhibit 34* April 11, 2024, Letter from Counsel for AmGUARD.
[97] *Id*. at p. 3.
[98] *Exhibit 22*, Deposition of Dan Kessinger, P. 36, Lines 4 – 11; P. 59, Line 25 – P. 60, Line 2.
[99] *St. Joseph Med. Clinic AMC v. Bankers Ins.,* 2024 BL 206870, at *2 (E.D. La. June 17, 2024).
[100] *Id*.
[101] *Cole v. Garrison Prop. & Cas. Ins*., 2023 BL 383430, at *3 (M.D. La. Oct. 26, 2023).

Contractually specified appraisal awards are presumed accurate. Appraisal awards are presumed correct, unless the award contains clear mistakes of fact.[102] However, Courts "should not disrupt an appraisal award simply because reasonable minds could differ as to the amount awarded or the methods employed."[103] Every reasonable intendment and presumption is in favor of an award of appraisers selected to determine the value of property lost.[104] The burden of showing that an appraisal award should not be confirmed falls on the party who challenges it.[105]

1.    **The Parties Agreed the Appraisal Award Will Be Binding.**

In accordance with Louisiana law, appraisal agreements are treated as contracts, and courts will enforce the binding nature of these agreements if they reflect the mutual intent of the parties.[106]

In addition to the language of appraisal in the policies, the Parties agreed to be bound by a specific Appraisal Agreement and Protocol.[107] The appraisal language under Policy 1 and 2 are identical and state:

> If we and you disagree on the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the amount of loss. If they fail to agree, they will submit their differences to the umpire. Each party will:
> a. Pay its chosen appraiser; and
> b. Bear the other expenses of the appraisal and umpire equally.
>
> If there is an appraisal, we will still retain our right to deny the claim.[108]

The Appraisal Agreement and Protocol states that "The amount of loss as contained in the Award, determined in compliance with this Agreement, will be binding upon Windsor Village and

---

[102] *St. Joseph Med. Clinic*, 2024 BL 206870, at *2.
[103] *St. Charles Par. Hosp. Serv. Dist. No. 1 v. United Fire & Cas. Co.*, 681 F. Supp. 2d 748, 760 (E.D. La. 2010).
[104] *Id*.
[105] *Cole*, 2023 BL 383430, at *3.
[106] *Id*.
[107] *Exhibit 18*.
[108] *Exhibit 1*, Policy 1 at AmGUARD 0001067; *Exhibit 3*, Policy 2 at AmGUARD 001419.

AmGUARD."[109] This agreement reflects the mutual intent of the parties to resolve the ongoing dispute and avoid further litigation pertaining to the amount of loss related to Claim 1 and Claim 2. The court in *Cole* noted that the common intent of the parties in contractual agreements governs interpretation, and here, the parties' intent was to be bound by the appraisal process. Both parties understood that the result of the appraisal process would serve as the final resolution of their disputes concerning the amount of loss.

Given the clear terms of the Appraisal Agreement and Protocol and the intent of the parties to streamline the dispute resolution process, the final appraisal award issued on March 21, 2024, should be confirmed. AmGUARD's dissatisfaction with the outcome does not negate the binding nature of the agreement. Further, for the many reasons discussed herein, the Appraisal Agreement and Protocol was followed by Mr. Irwin and Mr. Moore in rendering the appraisal award. It was AmGUARD's appraiser who admitted to violating the protocol, and caused multiple delays, leading the Parties to modify the Appraisal Agreement and Protocol so that the umpire could consider Mr. Kessinger's position. Any further delay in confirming the award would undermine the very purpose of the appraisal process.

## 2. The Appraisal Panel Issued the Award in Accordance with the Policies and the Appraisal Agreement and Protocol.

Under Louisiana law, binding appraisal provisions are enforceable absent a showing that the appraisal failed to comply with the express terms of the contract or evidence that the panel members were not competent (qualified to appraise the property) or disinterested (without any personal financial stake in the outcome of the appraisal award, beyond their appraisal fee).[110]

---

[109] *Exhibit 18,* at p. 2.
[110] *See* La. R.S. § 22:1311; *see also St. Charles Parish Hosp. Serv. Dist. No. 1 v. United Fire & Cas. Co.,* 81 F. Supp. 2d 748 (E.D.La. 2010); *Prien Props., LLC v. Allstate Ins. Co.,* No. 07–845, 2008 WL 1733591, at *2 (W.D.La. Apr. 14, 2008); *Branch v. Springfield Fire & Marine Ins. Co.,* 198 La. 720, 4 So.2d 806 (1941).

When reviewing whether the Parties complied with terms of the appraisal, this Honorable Court has placed great weight on looking at whether both appraisers had an opportunity to participate in the appraisal process, and the fact that a decision agreed to by any two (appraisers and/or umpire) is strictly construed.[111] As the evidence shows, the Appraisal Agreement and Protocol was followed and later modified by the Parties, the appraisers participated, and Mr. Irwin and Mr. Moore signed an award in compliance.

On June 21, 2023, WVCOA appointed Luke Irwin as its appraiser.[112] AmGUARD named its appraiser, Dan Kessinger, on August 1, 2023.[113] By August 31, 2023, both parties agreed upon Joel H. Moore as the neutral umpire.[114]

Mr. Irwin and his team conducted a comprehensive inspection of the Property from August 7 to August 9, 2023.[115] By October 30, 2023 (90 days after the appointment of Mr. Kessinger) the appraisers had not agreed on the amount of the loss, and would therefore submit any differences to the umpire.[116]

Mr. Kessinger did not complete an inspection of the Property until November 16, 2023.[117] Mr. Kessinger testified he completed an estimate for the roofs following his November 16, 2023, inspection.[118]

On February 1, 2024, Mr. Irwin provided Mr. Kessinger a thumb drive containing a number of documents, including an estimate, representing his position as to the amount of loss and

---

[111] *Cole,* 2023 BL 383430, at *5.
[112] *Exhibit 17*, Emails Between Counsel dated June 14, 2023, through June 21, 2023.
[113] *Exhibit 19*, Email naming AmGUARD Appraiser dated August 1, 2023.
[114] *Exhibit 21, Appraisal Panel Agreement.*
[115] [Doc. 87, ¶ 32.]
[116] *Exhibit 18*, Appraisal Agreement and Protocol at p. 4.
[117] *Exhibit 22*, Deposition of Dan Kessinger, at P. 43, Lines 3 – P. 45, Line 8.
[118] *Id*. at P. 47, Lines 1-12.

delineating between the losses caused by Hurricane Delta and Hurricane Ida.[119] Mr. Irwin also indicated that the Parties wanted the appraisal process completed by March of 2024.[120]

Mr. Kessinger received the thumb drive sent by Mr. Irwin and reviewed Mr. Irwin's position prior to the appraisal panel joint inspection.[121] The appraisal panel performed a joint inspection on February 21, 2024.[122] The panel inspected the property using a sampling method of the buildings and walked the entire exterior of the property.[123] According to both Mr. Moore and Mr. Irwin, Mr. Kessinger was in agreement with the scope of Mr. Irwin's position outside of an obvious number transposition error on the pool estimate.[124] This included that the roofs required replacement, code upgrades, fencing damage, cladding and gutters, and interior damages.[125]

On February 29, 2024, counsel for AmGUARD emailed Mr. Irwin and Mr. Kessinger to notify them that the Parties had agreed to allow the panel until March 19, 2024, to issue an award.[126] All parties and the panel agreed to modify the Appraisal Agreement and Protocol to allow each respective appraiser's position to be considered by the umpire without restriction.[127]

Crucially, during this joint inspection, Mr. Kessinger verbally agreed with many of Mr. Irwin's conclusions, including the need to replace the roofs, address code upgrades, and repair

---

[119] *Exhibit 20,* at Kessinger 009062; *See also Exhibit 23,* Luke Irwin's Appraisal Position and Estimate.
[120] *Id.*
[121] *Exhibit 22,* Deposition of Dan Kessinger at 67, Lines 11 – 16.
[122] *Exhibit 24,* Deposition of Joel Moore at P. 100, Line 22 – P. 101, Line 8; *Exhibit 20* at Kessinger 009057 – 009059.
[123] *Exhibit 24,* Deposition of Joel Moore at P. 106, Line 22 – P. 107, Line 13.
[124] *Id.* at P. 144, Line 8 – P. 146, Line 3; *Exhibit 25,* Deposition of Luke Irwin, at P. 70, Line 21 – P. 71, Line 11.
[125] *Id.*
[126] *Exhibit 35,* Emails dated February 29, 2024, through March 12, 2024.
[127] *Id.* The Appraisal Agreement and Protocol required that in order for information to be considered by the umpire from an appraiser, the appraiser must first provide that information first to the opposing appraiser at least 14 days before submitting it to the umpire. Because Mr. Kessinger had yet to submit his position, the umpire would not have been able to consider it because Mr. Kessinger first had to provide his position to Mr. Irwin, then wait 14 days before sending it to Mr. Moore. The Parties mutually agreed to modify this aspect of the Appraisal Agreement and Protocol so that the umpire could consider all positions. AmGUARD and its counsel willingly participated in this process and raised no objections that the Appraisal Agreement and Protocol was not being followed.

damage to fences, cladding, gutters, and the interior of the buildings.[128] However, when Mr. Kessinger later submitted his written position, he omitted several of these agreed-upon items, including the roof decking, roof framing, tarping, and fencing.[129] Kessinger's written submission failed to differentiate between damages caused by the two hurricanes, a critical component of the appraisal process agreed to by the parties.[130] Further, during the joint inspection, Mr. Kessinger refused to provide the estimate he claims to have created following his inspection in November of 2023, which Mr. Moore testified affected his credibility.[131]

As we now know, Mr. Kessinger's representations to the umpire that his appraisal position was supported by two "live bids" were false. One of the bids was discarded because it was unrealistically low (though it exceeded AmGUARD's evaluation of Claim 1 by more than $600,000).[132] The other was obtained under misleading pretenses and presented as a live bid, an act the owner of Coleman Roofing and Construction believes was meant to "cheat the appraisal process."[133]

In contrast, Mr. Irwin's estimate thoroughly addressed the separate damages caused by Hurricanes Delta and Ida, aligning with the Appraisal Agreement's requirement to itemize the losses attributable to each event.[134] On March 18, 2024, Mr. Moore submitted a proposed appraisal award via email to the panel.[135] On March 19, 2024, Mr. Moore sent the panel an email stating "As umpire, I believe we have given this file ample review. I too reviewed all the pertinent data

---

[128] *Exhibit 24*, Deposition of Joel Moore at P. 144, Line 8 – P. 146, Line 3; *Exhibit 25*, Deposition of Luke Irwin, at P. 70, Line 21 – P. 71, Line 11.
[129] *Exhibit 24*, Deposition of Joel Moore at P. 144, Line 8 – P. 146, Line 21.
[130] *Exhibit 22*, Deposition of Dan Kessinger P. 74, line 8 – P. 75, Line 4
[131] *Id*., at P. 61, Lines 1-9; P. 62, Lines 1 – 13; *Exhibit 24*, Deposition of Joel Moore, at P. 105, Line 11 – 24; P. 236, Lines 1-4; P. 233, Lines 1-22; *Exhibit 25*, Deposition of Luke Irwin at P. 69, Lines 1 – 22
[132] *Exhibit 22*, Deposition of Dan Kessinger at P. 80, Line 3 – 22; *see also Exhibit 8*.
[133] *Exhibit 29,* Affidavit of Chris Yancey.
[134] *Exhibit 23*, Luke Irwin's Appraisal Position and Estimate.
[135] *Exhibit 22*, Appraisal Panel Emails at Kessinger 009043.

provided and am certain we have a viable product for the attorneys to review and consider. Thank you for the opportunity to help with this appraisal."[136]

Mr. Kessinger reviewed the award and identified an error, which the panel agreed to and did fix.[137] Pursuant to the Appraisal Agreement and Protocol, the final appraisal award specifically itemized the costs associated with each building, each hurricane, and any applicable code upgrades per building.[138]

On March 21, 2024, Mr. Kessinger emailed the panel stating that the final award contained "mistakes that artificially inflate the award."[139] A few minutes later, Mr. Irwin responded to Mr. Kessinger's email and asked Mr. Kessinger to specifically point out the mistakes in detail so the panel could reopen and correct if necessary.[140] Mr. Kessinger never responded to the panel identifying any specific mistake.[141]

Mr. Moore did not definitively agree with either party in issuing an award. Mr. Irwin's estimate was $11,430,388.79 in RCV and $11,237,160.09 in ACV, with the clerical error on the pool house which was fixed.[142] Mr. Moore removed at least 120 line-items and lowered the overall estimate by $1,918,222.82 in RCV and $1,912,130.97 in ACV.[143]

The entire appraisal process followed the terms and procedures set forth in the Appraisal Agreement and Protocol, and later modified by the Parties, and there is no evidence that the appraisers or umpire acted outside their designated roles. The final award should therefore be

---

[136] *Id*. at Kessinger 009039.
[137] *Id*. at Kessinger 009036; *Exhibit 32*, Final Appraisal Award.
[138] *Exhibit 32*, Final Appraisal Award; *Exhibit 33* Final Appraisal Award Valuation.
[139] *Exhibit 20*, Appraisal Panel Emails at Umpire Moore 2020-2021 (Page 1 and 2 of the .pdf).
[140] *Id*.
[141] *Exhibit 22*, Deposition of Dan Kessinger at P. 97, Line 8 – 22; P. 99, Line 7 – P. 100, Line 8.
[142] *Exhibit 23,* Luke Irwin's Appraisal Position and Estimate.
[143] *Id*.; *Exhibit 33*, Final Appraisal Award Valuation.

confirmed as it was made in full compliance with the agreement, reflecting a fair and impartial resolution of the parties' dispute over the amount of loss.

**3.  Defendant Cannot Meet Its Burden to Show There Were Any Mistakes, Bias, or Unqualified Appraisers**

Under Louisiana law, the party challenging an appraisal award bears the burden of proving that the award is invalid due to mistakes, bias, or the disqualification of the appraisers. Appraisal awards are presumed correct unless there are clear mistakes of fact, and the party challenging the award must provide substantial evidence to overcome this presumption.[144]

Appraisal provisions are intended to offer a final and binding resolution on the amount of loss, and courts are reluctant to interfere with the findings of an appraisal panel unless there is a showing of fraud, bias, or failure to comply with the agreed-upon procedures (*St. Charles Par. Hosp. Serv. Dist. No. 1 v. United Fire & Cas. Co.*, 681 F. Supp. 2d 748, 760 (E.D. La. 2010)). This burden falls squarely on AmGUARD, which must demonstrate that there were mistakes in the appraisal award, that the panel was biased, or that the appraisers were unqualified. In this case, AmGUARD will not be able to meet its burden on any of these grounds.

i.  <u>No Evidence of Mistakes in the Award</u>

AmGUARD has raised vague and unsupported claims that the final appraisal award contains "mistakes that artificially inflate the award." However, AmGUARD has not provided any concrete evidence or identified specific errors that would justify setting aside the award. Louisiana courts have consistently held that mere disagreement with the outcome of an appraisal is not sufficient to invalidate the award. An appraisal award should not be disturbed simply because "reasonable minds could differ as to the amount awarded or the methods employed."[145] The

---

[144] *St. Joseph Med. Clinic AMC*, 2024 BL 206870, at *2.
[145] *St. Charles Par. Hosp.*, 681 F. Supp. 2d at 760.

presumption of correctness applies unless there is clear and convincing evidence of factual mistakes, which AmGUARD has not presented.

The only issues raised by AmGUARD's appraiser, Mr. Kessinger, were numerical errors and have already been corrected by the panel. This clerical error was immediately addressed and corrected by Mr. Irwin and Mr. Moore. Beyond this, Mr. Kessinger failed to provide any detailed explanation of the supposed mistakes when asked by Mr. Irwin to do so. This lack of specificity further weakens AmGUARD's argument, as Louisiana law requires challengers to clearly articulate any alleged errors in the award.[146]

ii.    No Evidence of Bias

AmGUARD's claim of bias in the appraisal process is similarly without merit. AmGUARD has insinuated that the neutral umpire, Joel Moore, was biased, but it has presented no evidence to support this allegation. Louisiana courts require substantial proof to support claims of bias, and speculative assertions are insufficient to meet this burden. An appraisal award will only be set aside if there is clear evidence that the appraisers were biased or failed to act in good faith.[147]

Plaintiff would note that this Honorable Court has already found Mr. Moore to be "well-qualified for the position and would likewise serve as a neutral umpire."[148] This is not surprising because Mr. Moore's resume is impressive. After spending most of his career working as an experienced independent claims adjuster on behalf of insurance companies, Mr. Moore transitioned to focusing on appraisals.[149] Mr. Moore has served as the National President of the

---

[146] *Cole*, 2023 BL 383430, at *3.
[147] *Prien Props., LLC v. Allstate Ins. Co.*, No. 07–845, 2008 WL 1733591, at *2 (W.D. La. Apr. 14, 2008).
[148] *Exhibit 36*, Order in Civil Action No. 22:951-SDD-RLB; *Dorian Theodore v. Allied Trust Insurance Company*, In the United States District Court for the Middle District of Louisiana [Doc. 31]. The Court was asked to select an umpire. The Court selected Cade Cole to serve as umpire but noted that Mr. Moore was qualified and would serve adequately as a neutral umpire.
[149] *Exhibit 37*, Curriculum Vitae of Joel Moore.

National Association of Independent Insurance Adjusters (NAIIA).[150] Mr. Moore was also a former member of the Louisiana Property and Casualty Insurance Commission Claims and Litigation Management Alliance.[151] Notably, Mr. Moore helped author the curriculum for the Certified Insurance Appraiser (CIA) and Certified Insurance Umpire (CIU) professional designation offered through the National Association of Independent Insurance Adjusters and Society of Registered Professional Adjusters.[152]

AmGUARD's attempt to discredit Mr. Moore after the award was unfavorable to them is both speculative and unsupported by the facts. As the court in *St. Charles Par. Hosp.* emphasized, claims of bias must be supported by actual evidence showing improper conduct by the appraisers or umpire.[153] Here, AmGUARD has failed to produce any such evidence, and Mr. Moore's careful consideration of both appraisers' positions—evidenced by his significant reductions to Mr. Irwin's estimate—further supports his impartiality.

   iii.    The Appraisers Were Fully Qualified

AmGUARD has not provided any legitimate basis to challenge the qualifications of the appraisers. Both Luke Irwin and Dan Kessinger were appointed as appraisers in accordance with the Appraisal Agreement and Protocol, and both appraisers were experienced and qualified to assess the damage at the Windsor Village property. AmGUARD has not raised any substantive arguments challenging Mr. Irwin's qualifications, and there is no evidence suggesting that Mr. Moore, as the neutral umpire, lacked the requisite qualifications or experience to serve in that role.

---

[150] *Id.*
[151] *Id.*
[152] *Id.*
[153] *St. Charles Par. Hosp.*, 681 F. Supp. 2d 748, 754 (E.D. La. 2010).

In summary, AmGUARD cannot meet its burden to show that the appraisal award should be set aside on the grounds of mistakes, bias, or unqualified appraisers. The award was the product of a fair, thorough, and impartial process that adhered to the terms of the Appraisal Agreement. Under Louisiana law, the final award is presumed correct and should be confirmed by the Court.

**4.    In the Unlikely Event the Court Finds Any Error, The Court Should Remand the Matter to the Panel for Correction and Confirmation**

As a threshold matter, Louisiana Federal Courts take the view that appraisal awards are presumed correct.[154] A Court should not disrupt an appraisal award simply because reasonable minds could differ as to the amount awarded or the methods employed.[155] "Mere inadequacy of the amount of the award or a mistake of judgment on the part of the appraisers in arriving at the sum to be allowed would not be sufficient to authorize a court of equity to interfere unless the inadequacy is so great as to indicate corruption or bias on the part of the appraisers."[156]

Even if the Court finds a clear mistake, the appropriate remedy is to remand the matter to the appraisal panel for correction and confirmation.[157] As the Eastern District of Louisiana has noted, the purpose of the appraisal process is to "obviate the need for the factfinder in a court proceeding to determine the value of the property in question."[158] Thus, even in the unlikely event this Court finds a clear error exists that must be corrected, the Court should remand the matter back to the appraisal panel to cure the error and later confirm the appraisal award.

## CONCLUSION

For the reasons set forth above, Plaintiff respectfully requests that this Court enforce and confirm the appraisal award issued on March 21, 2024, in accordance with applicable insurance

---

[154] *Id.* at 760.
[155] *Id.*
[156] *Dawes v. Continental Ins. Co. of New York*, 1 F. Supp. 603, 606 (E.D. La. 1932)
[157] *St. Charles Par. Hosp. Serv. Dist. No. 1 v. United Fire & Cas. Co.*, 681 F. Supp. 2d 748, 765 (E.D. La. 2010)
[158] *Id*

policies and the binding Appraisal Agreement and Protocol entered into by the parties. The appraisal process was conducted fairly, impartially, and in full compliance with the terms agreed upon by both parties. Defendant AmGUARD Insurance Company has failed to provide any valid basis to challenge the award, and its continued refusal to honor the appraisal only serves to delay this litigation unnecessarily.

Respectfully submitted:

*/s/ Michael S. Barcus*
**BARCUS ARENAS, PLLC**
Michael S. Barcus
Louisiana Bar No. 38979
Aaron J. Arenas, *pro hac vice*
Federal ID No. 3293005
2200 N Loop W, Suite 108
Houston, Texas 77018
Phone: 800-941-1041
Direct: 832-216-6691
michael@barcusarenas.law
aaron@barcusarenas.law

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on September 17, 2024, a true and correct copy of the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system, which will send notice of electronic filing to all CM/ECF participants.

/s/ *Michael S. Barcus*
Michael S. Barcus