## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| WINDSOR VILLAGE CONDOMINIUM OWNER'S ASSOCIATION | * * * | CIVIL ACTION NO:    3:21-cv-00468-BAJ-SDJ |
| VERSUS | * * | JUDGE BRIAN A. JACKSON |
| BERKSHIRE HATHAWAY GUARD INSURANCE COMPANY and AMGUARD INSURANCE COMPANY | * * | MAGISTRATE JUDGE SCOTT D. JOHNSON |

* * * * * * * * * * * * * * * * * * * * * * * * * *

### AMGUARD INSURANCE COMPANY'S OPPOSITION
### TO PLAINTIFF'S MOTION TO ENFORCE THE APPRAISAL AWARD

Defendant AmGUARD Insurance Company respectfully submits this memorandum in opposition to plaintiff Windsor Village Condominium Owner's Association's motion to enforce the March 20, 2024 appraisal award issued by umpire Joel Moore.

### **INTRODUCTION**

Windsor Village's motion ignores well-settled Louisiana law that allows an appraisal award to be enforced only if the appraisers and umpire "performed the duties required of them."[1]  Apart from Windsor Village's bald proclamations that its appraiser Luke Irwin and the umpire Joel Moore were "qualified and unbiased,"[2] Windsor Village's motion does nothing to show Mr. Irwin and Mr. Moore performed their contractual and statutory duties—because they did not.  Windsor Village instead spends most of its brief on irrelevant allegations regarding AmGUARD's claim handling before the appraisal—which are vehemently denied—and which do nothing to show the appraisal

---

[1]    *E.g.*, *Branch v. Springfield Fire & Marine Ins. Co. of Springfield, Mass.*, 4 So. 2d 806, 809 (La. 1941) ("In order for the award of the appraisers to be binding, it must clearly appear that they have performed the duties required of them by the policy, which is the law between the contracting parties."); *accord O'Connor v. Allied Tr. Ins. Co.*, No. 23-218, 2023 WL 3019926, at *1 (E.D. La. Apr. 20, 2023); *Fourchon Docks, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, No. 86-2267, 1988 WL 32938, at *8 (E.D. La. Apr. 6, 1988).

[2]    Rec. Doc. 126-1 at 1.

award should be enforced.

Fatal to its request to enforce the award, Windsor Village's motion wholly ignores Mr. Irwin's contractual duties to meet with Mr. Kessinger—prior to invoking the umpire—to "attempt in good faith to resolve any disputes or differences,"[3] and Windsor Village offers no justification for Mr. Irwin's refusal to respond to Mr. Kessinger for a six-month period after inspecting the property in August 2023.[4] Windsor Village's motion also disregards Mr. Irwin's contractual duties to submit only differences to the umpire,[5] and Mr. Irwin's inexplicable, unilateral invocation of the umpire before making any effort to reach agreements with Mr. Kessinger.[6] Windsor Village avoids these facts because they establish clear breaches of the parties' contract that render the award unenforceable as a matter of law.[7]

Windsor Village also lodges attacks on AmGUARD's appraiser, Dan Kessinger, but it never explains why its accusations against Mr. Kessinger warrant enforcing the award. The motion

---

[3]    (Ex A, Appraisal Agreement and Protocol at p. 4, ¶ C(2)).

[4]    *See* Rec. Doc. 126-1 at 6-8.

[5]    (Ex A, Appraisal Agreement and Protocol at p. 5, ¶¶ D(2)-(4)).

[6]    *See* Rec. Doc. 126-1 at 7, 16-17.

[7]    *E.g.*, *Branch*, 4 So. 2d at 809; *O'Connor*, No. 23-218, 2023 WL 3019926, at *1; *Fourchon Docks, Inc.*, No. 86-2267, 1988 WL 32938, at *8 (E.D. La. Apr. 6, 1988). Windsor Village does not and cannot explain Mr. Irwin's unilateral invocation of the umpire. The closest the opposition comes addressing Mr. Irwin's gamesmanship is as follows: "By October 30, 2023 (90 days after the appointment of Mr. Kessinger) the appraisers had not agreed on the amount of the loss, and would therefore submit any differences to the umpire." Rec. Doc. 126-1 at 16. But Windsor Village ignores that the appraisal agreement requires the appraisers to first notify the parties of their failure to agree, allows for the extension of the 90-day timeline by agreement, disregards the requirement that the appraisers attempt to narrow their differences before invoking the umpire, and sidesteps that Mr. Irwin had no good faith basis to unilaterally invoke the umpire on February 1, 2024. (Ex A, Appraisal Agreement and Protocol at pp. 4-5, ¶¶ C(2)-(3), D(2)-(4)). What is more, Paragraph (C)(3) provides that the umpire can be invoked only if "the Parties do not agree regarding an extension of time[.]" (*Id.* at p.4, ¶ C(3)). However, the Parties here agreed to the extensions of time necessitated by Mr. Irwin's delays to allow more time for the appraisers to attempt to reach any agreements—but Mr. Irwin did not use the additional time for that purpose.

alleges that "the facts show Mr. Kessinger's position was riddled with falsehoods."[8]  But the actual evidence shows otherwise.  Although Mr. Kessinger made one typographical error in his position paper (that his position was supported by two live bids),[9] this is not a "falsehood" because his position attached one bid; and because there is no evidence Mr. Moore even read or considered Mr. Kessinger's position, Windsor Village cannot claim this typographical error had any impact on Mr. Moore's decision to rubber-stamp Mr. Irwin's position *before* he received Mr. Kessinger's position.[10] At bottom, none of Windsor Village's accusations against Mr. Kessinger were reasons Mr. Moore sided with Mr. Irwin during the appraisal—Mr. Moore did not resolve any of the appraisers' differences because he completed his estimate before he knew Mr. Kessinger's position,[11] in direct violation of his contractual and statutory duties.[12]  The appraisal award should be vacated, not enforced.[13]

## LAW AND ARGUMENT

### I.     Windsor Village Cannot Enforce an Award Under a Contract That Its Appraiser Breached.

Windsor Village's motion ignores the terms of the parties' Appraisal Agreement and Protocol that sets forth detailed duties required of the appraisers and umpire because Mr. Irwin did not comply with those duties.  Indeed, Louisiana law does not permit Windsor Village to enforce

---

[8]      Rec. Doc. 126-1 at 2.

[9]      Rec. Doc. 130-7 at 25 (Depo. Transcript 98:16-22).

[10]     Rec. Doc. 130-5 at 42-43 (Depo. Transcript 163:20-164:2; 168:3-7).

[11]     *Id.*

[12]     (Ex A, Appraisal Agreement and Protocol at p. 5 ¶ D(2)).

[13]     For a more detailed discussion of the *relevant* factual background regarding the Panel's contractual agreements and timeline of the appraisal, AmGUARD refers to the Background set forth in its motion to vacate the appraisal award.

an award under the very contract that its appraiser breached.[14]  Louisiana federal courts hold appraisal awards to be unenforceable where an appraisal deviates from the parties' contractual terms regulating the appraisal.[15]  Louisiana law does not consider whether the failure to perform is harmless[16]—the standard is simply whether the obligations mandated by contract were performed.[17]  Indeed, this requirement is part of the agreement itself, under which the amount of loss determined in the appraisal award is binding only if it is "determined in compliance with this Agreement."[18]

Disregarded in Windsor Village's motion, the Appraisal Agreement and Protocol also contains a specific section—entitled "Appraisal Proceeding"—that emphasizes the appraisers' obligations to meet and confer to reach agreements before invoking the umpire:

> ➢ The appraisers "shall meet to attempt in good faith to resolve any disputes or differences and to narrow the disputes and differences that must be addressed in the proceedings before the Umpire,"[19]

> ➢ "If the Appraisers do not agree on the amount of the loss within ninety (90) days of their appointment they shall notify the Parties who may by written agreements allow one or more extensions of time for the Appraisers to reach agreement."[20]

---

[14]   *E.g.*, *Branch*, 4 So. 2d at 809 ("In order for the award of the appraisers to be binding, it must clearly appear that they have performed the duties required of them by the policy, which is the law between the contracting parties."); *accord O'Connor*, No. 23-218, 2023 WL 3019926, at *1 ("[A]n appraisal award issued under an insurance policy is binding only if the appraisers have performed the duties required of them by the policy, which is the law between the contracting parties."); *Fourchon Docks, Inc.*, No. 86-2267, 1988 WL 32938, at *8 ("The appraisal is not binding on the parties if the appraisers and umpire fail to discharge their duty . . . .").

[15]   *St. Charles Par. Hosp. Serv. Dist. No. 1 v. United Fire & Cas. Co.*, 681 F. Supp. 2d 748, 764 (E.D. La. 2010); *Lewis v. Republic Fire & Cas. Ins. Co.*, No. 15-0035, 2016 WL 112732, at *6 (W.D. La. Jan. 8, 2016); *Spann v. Southern Fidelity Insurance Co.*, No. 13-6134, 2014 WL 4443527, at *3 (E.D. La. Sept. 9, 2014).

[16]   *Girard v. Atl. Mut. Ins. Co.*, 198 So. 2d 444, 446 (La. 4th Cir. App. 1967).

[17]   *Branch*, 4 So. 2d at 809.

[18]   (Ex A, Appraisal Agreement and Protocol at p. 2, ¶14).

[19]   (*Id.* at p. 4, ¶ C(2)).

[20]   (*Id.* at p. 4, ¶ C(3)).

> ➢ "If the Appraisers do not agree on as to the amount of the loss, whether damage was caused by Hurricane Ida or Hurricane Delta, or whether any building code or ordinance would apply, they will submit the differences about each item as to which they disagree to the Umpire."[21]

Mr. Irwin did not comply with his meet-and-confer obligations.  These requirements in the Appraisal Agreement and Protocol must be *strictly construed* under Louisiana law.[22]

Critically, there is no provision in the Appraisal Agreement and Protocol that endorses Mr. Irwin's tactics in this appraisal—invoking the umpire before attempting to reach agreements with the opposing appraiser, and sending his position to the umpire and opposing appraiser at the same time.[23]  Indeed, Mr. Irwin admitted as much at his deposition, confessing that "we were already in violation of the memorandum when we signed it," and that "once we signed it, it was already a violation of itself."[24]  But that is not accurate; when the Appraisal Agreement and Protocol was signed in December 2023, Mr. Irwin had already completed his estimate yet inexplicably waited until February 1, 2024—after unilaterally invoking the umpire—to share his estimate with Mr. Kessinger.[25]  Mr. Irwin had every opportunity to meet with Mr. Kessinger (both before and after execution of the contract), but Mr. Irwin decided instead to wait almost two months after execution of the contract to invoke the umpire on the eve of the Court's deadline to complete the appraisal. After Mr. Irwin finally decided to engage, the parties were forced to request a *second* extension

---

[21]    (*See also id*. at p. 5, ¶ D(2) (appraisal award section)).

[22]    *See Firefighters' Ret. Sys. v. Consulting Grp. Servs.,* LLC, 541 B.R. 337, 348 (M.D. La.2015) ("If the words of the contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent and the agreement must be enforced as written."); *Gulf Eng'g Co., LLC. v. Dow Chem. Co*., 334 F.Supp.3d 804, 808 (M.D. La.2018) (When a contract can be construed from the four corners of the contract, without the need for extrinsic evidence, the question of contractual interpretation is answered as a matter of law.") (internal quotations removed); La. Civ. Code art. 2047.

[23]    Rec. Doc. 126-20 at 29-30.

[24]    *See* Rec. Doc. 130-3 at 20 (Depo. Transcript 75:17-19), 61 (Depo. Transcript 239:18-20).

[25]    Rec Doc. 126-20 at 31-32, 29-30.

from the Court and the Panel rushed to perform a joint inspection and complete the appraisal before the Court's March 19, 2024 status conference.[26]

Although Windsor Village attempts to blame Mr. Kessinger for a delay after the February 21, 2024 joint inspection,[27] the record is clear that Mr. Irwin breached the Appraisal Agreement much earlier over the course of a six-month period before the joint inspection, and Windsor Village ignores that the parties agreed to permit Mr. Kessinger to provide his position by the week of March 4 for the umpire's consideration. Further, Windsor Village's motion fails to mention these uncontested facts established in AmGUARD's motion to vacate:

> ➤ Mr. Irwin inspected the property between August 7-9, 2023, promised to send Mr. Kessinger materials on August 28, and Mr. Irwin's team completed their estimates by October 16.[28]

> ➤ The parties agreed to an extension of the Court's initial December 8 deadline to complete the appraisal, yet Mr. Irwin did nothing to share his position or reach an agreement with Mr. Irwin until he unilaterally invoked the umpire on January 29, 2024.[29]

> ➤ Mr. Kessinger sent multiple text messages to Mr. Irwin that he did not respond to, and despite Mr. Kessinger's requests, Mr. Irwin did not provide any point of contact for Mr. Kessinger to inspect the property.[30]

Neither Windsor Village nor Mr. Irwin provided any explanation for Mr. Irwin's delay and refusal to attempt to reach any agreements with Mr. Kessinger. At most, Mr. Irwin claims that he was

---

[26]  Rec. Docs. 126-35 at 6; 126-20 at 22-23. The parties initially sought to complete the appraisal by the Court's March 12 deadline for the litigation, but scheduling conflicts and Mardi Gras did not permit the Panel to perform the joint inspection until February 21, and the Panel then agreed to allow Mr. Kessinger additional time to re-inspect certain areas and present his own position before March 8 (a Friday). Mr. Kessinger submitted his position on March 11 (the following Monday), but unbeknownst to Mr. Kessinger, Mr. Moore had already finished his estimate by making his minimal changes to Mr. Irwin's estimate on March 3, a week *before* receipt of Mr. Kessinger's position.

[27]  Rec. Doc. 126-1 at 15.

[28]  Rec. Docs 130-3 at 82 (Depo. Transcript 325:3-6), 23 (Depo Transcript 89:6-20); 130-6 at 6.

[29]  Rec. Docs. 78, 79, 126-20 at 31-32.

[30]  Rec. Docs. 130-10 1-2; 126-22 at 10 (Depo. Transcript 40:9-19).

forced to invoke the umpire because when he signed the December 4, 2023 Appraisal Agreement and Protocol, the initial 90-day meet-and-confer period in Paragraph (C)(3) had already lapsed.[31] But that does not explain why Mr. Irwin made no effort to confer with Mr. Kessinger after executing the contract and before unilaterally invoking the umpire—that same Paragraph (C)(3) contemplates the appraisers notifying the parties of their failure to agree and the parties' obtaining extensions of this time period for the appraisers to confer,[32] and the parties here in fact secured such extensions to accommodate Mr. Irwin's delays.[33]  And Mr. Irwin cannot use his own failure to respond to Mr. Kessinger's overtures and confer over any agreements between August and October 2023 as his justification for the lapsing of the initial 90-day period.[34]

Louisiana law is clear that contract terms must be complied with for an appraisal to be enforceable.[35] Here, there can be no serious dispute that Mr. Irwin failed to comply with any number of contractual provisions governing the appraisal. Indeed, Windsor Village cannot have this appraisal enforced where its own appraiser admitted he breached the agreement.  That reason alone shows the award cannot be enforced.

## II.    Mr. Moore Failed to Perform the Duties Required of Him under the Appraisal Agreements—Deferring Decisions to the Carrier and Collecting $75,000 in Fees.

Windsor Village's motion also disregards that an appraisal award is only binding if the umpire performed the duties required of him.[36]  The policy and appraisal agreement is the law

---

[31]    Rec. Doc. 130-3 at 64 (Depo. Transcript 251:17-252:5).

[32]    (Ex A, Appraisal Agreement and Protocol at p. 4 ¶ C(3)).

[33]    Rec. Docs. 79; 126-35 at 6.

[34]    What is more, Paragraph (C)(3) provides that the umpire can be invoked only if "the Parties do not agree regarding an extension of time[.]"  However, the Parties here agreed to the extensions of time necessitated by Mr. Irwin's delays to allow more time for the appraisers to attempt to reach any agreements—but Mr. Irwin did not use the additional time for that purpose.

[35]    *See Branch*, 4 So. 2d at 809.

[36]    *E.g.*, *Fourchon Docks, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, No. 86-2267, 1988 WL

between the contracting parties.[37]  If an appraiser or umpire fails to perform an appraisal as contracted, the appraisal "award is null for that reason alone."[38]

The omission of this black letter law was no oversight by Windsor Village: the umpire Joel Moore fell short of his contractual obligations.  The motion to enforce does not and cannot refute that Mr. Moore violated the Panel Agreement.  The Panel Agreement required Mr. Moore "to settle the matters of difference" between the two appraisers.[39]  Resolving differences between the parties' appraisers is, of course, "the entire purpose of the umpire's involvement in the process."[40]  But Mr. Moore never decided differences submitted by Mr. Kessinger and Mr. Irwin, let alone hold a hearing to resolve disputes line-by-line as the agreement contemplated.  The umpire failed to review or consider Mr. Kessinger's narrative report, testifying that he first learned of the disagreements months after closing the appraisal.[41]  Mr. Moore instead rubberstamped Mr. Irwin's position and—violating the Panel Agreement—withheld the appraisal award by demanding payment of $75,000 after spending just over 5 hours in Mr. Irwin's Xactimate file.[42]

The only defense of Mr. Moore that Windsor Village can marshal is: (a) the parties agreed for Mr. Moore to serve as umpire;[43] (b) Mr. Moore made "significant reductions to Mr. Irwin's

---

32938, at *8 (E.D. La. Apr. 6, 1988) ("The appraisal is not binding on the parties if the appraisers and umpire fail to discharge their duty . . . .").

[37]  *Branch*, 4 So. 2d at 809.

[38]  *See id.*; *Fourchon Docks, Inc.*, No. 86-2267, 1988 WL 32938, at *8.

[39]  Rec. Doc. 126-21 at 1.

[40]  *Spann*, No. 13-6134, 2014 WL 4443527, at *2 ("Resolving disagreements between the parties' appraisers is 'the entire purpose of the umpire's involvement in the process,' and is not in and of itself evidence of bias or impartiality.").

[41]  Rec. Doc. 130-5 at 33 (Depo. Transcript 126:8-128:4), 50-51 (Depo. Transcript 197:17-198:3).

[42]  Rec. Docs. 126-20 at 17; 130-5 at 54 (Depo. Transcript 210:3-5); 130-15 at 10.

[43]  Rec. Doc. 126-1 at 1, 7, 16.

8

estimate;"[44] and (c) Mr. Moore followed the Appraisal Agreement and Protocol in rendering the appraisal award.[45] ***First***, Mr. Moore did not follow the Appraisal Agreement and Protocol. Ignoring the terms of the Appraisal Agreement and Protocol, Mr. Moore described his duties as assembling an "all encompassing"[46] estimate of "everything"—regardless of what caused the damage,[47] whether the estimate reflects actual damage, or whether code upgrades are necessary— to put "in front of" the carrier.[48]  The following chart summarizes additional examples of where Mr. Moore did the opposite of what the Appraisal Agreement and Protocol required of the Panel:

| Duties Required of Mr. Moore in Appraisal Protocol | Mr. Moore's Testimony: Failure to Perform as Contracted in Appraisal Protocol |
|---|---|
| "If the Appraisers do not agree on as to the amount of the loss … the Umpire will then make a determination as to each item."[49] | "[W]hether it is damaged or whether it is covered is not our responsibility."[50] |
| "If the Appraisers do not agree on …whether damage was caused by Hurricane Ida or Hurricane Delta . . . the Umpire will then make a determination as to each item."[51] | "We [] may discuss causation but we don't determine causation."[52] |
| "If the Appraisers do not agree on …whether any building code or ordinance would Apply . . . the Umpire will then make a | "I included it because it is up to the carrier to determine if code upgrades or law and ordinance is going to be required and if they |

---

44    *Id.* at 12, 19.

45    *Id.* at 15-16.

46    Rec. Doc. 130-5 at 50(Depo. Transcript194:1-9).

47    *Id*. at 12 (Depo. Transcript 45:2-11), 50 (Depo. Transcript 197:3-8).

48    *E.g.,* Rec. Docs. 130-5 at 38 (Depo Transcript 146:24), 40 (Depo. Transcript 156:3-9), 12 (Depo. Transcript 45:2-11).

49    (Ex A, Appraisal Agreement and Protocol at p. 5 ¶¶ (D)(2)-(4)).

50    Rec. Doc. 130-5 at 13 (Depo. Transcript 46:10-23).

51    (Ex A, Appraisal Agreement and Protocol at p. 5 ¶¶ (D)(2)-(4)).

52    Rec. Doc. 130-5 at 18 (Depo. Transcript 67:4-9).

| | |
|---|---|
| determination as to each item."[53] | want to go down to Baton Rouge and find out if the building code requires it, then they will do that."[54] |
| "The Panel will not consider the costs of correcting any damage, defects or code deficiencies that are not the direct result of the two storms or that are not necessary to repair damage directly caused by Hurricane Delta and Hurricane Ida."[55] | "[A]s a panel and as the umpire, I have to make sure that everything is addressed back to the carrier. . . . [T]hey need to be aware of it and address it however they choose to address it. . . . So, it's still in their lap as what they choose to do at that point. If they want to -- we don't care."[56] |

Mr. Moore clearly misunderstood his role as an umpire.  At the most threshold level, he refused to acknowledge his contractual obligation to include only the amounts "necessary to repair damage directly caused by Hurricane Delta and Hurricane Ida."[57]  When offered an opportunity to explain whether his award was limited to "amounts to address repairs for actually damaged portions of the property," Moore responded: "I can't answer that."[58]  Rather than decide differences as required by the Appraisal Agreement and Protocol, Mr. Moore foists decisions of scope of damage, causation, and coverage to the insurance carrier:

> It is the responsibility of the umpire to not only include those items that are necessary to repair the damage that has been addressed but also the variations of coverage and insurance that's in that contract, things that have to be addressed in appraisal. So -- I have to clarify.
>
> Again, everything that has to be addressed by the carrier of the ultimate dollar amount provided to them in the appraisal process is

---

[53]    (Ex A, Appraisal Agreement and Protocol at ¶¶ p. 5 (D)(2)-(4)).

[54]    Rec. Doc. 130-5 at 490 (Depo. Transcript 192:3-10).

[55]    (Ex A, Appraisal Agreement and Protocol at p. 5 ¶ (D)(6)).

[56]    Rec. Doc. 130-5 at 38 (Depo. Transcript 146:24-147:14).

[57]    *Compare* (Ex A, Appraisal Agreement and Protocol at at p. 5 ¶ (D)(6)), *with* Rec. Doc. 130-5 at 19 (Depo. Transcript 72:22-73:15).

[58]    Rec. Doc. 130-5 at 19 (Depo. Transcript 74:16-24).

> going to incorporate things that may or may not be part of their
> regular estimate . . . . [W]hether you agree that it should be in there
> or not, it needs to be in there as a dollar amount that may or may not
> be removed from the ultimate award by the carrier, not by us.[59]

Mr. Moore's approach of foisting everything "in front of" the carrier does nothing to resolve any disputes between the appraisers, and highlights his dereliction of contractual and statutory duties owed by an umpire in an appraisal.  Although the parties agreed to a binding appraisal that would resolve these issues of causation between the storms and the applicability of building codes, Mr. Moore's breach of the contract and failure to resolve *any disputes* highlights precisely why his award should be vacated: the award creates *more* disputes, accomplishes none of the efficiencies that appraisals seek to achieve, and is contrary to the purpose of the umpire's involvement in the process—deciding disagreements among the parties in order to achieve an efficient resolution of the claim.

*Second*, Windsor Village's motion repeats on four occasions how AmGUARD agreed to Mr. Moore as an umpire.[60]  The parties did agree to Mr. Moore serving as an umpire.[61]  That agreement is, however, no excuse for Mr. Moore's failure to perform the duties required of him. The statement Windsor Village trumpets in its motion also ignores the information withheld at the time of selection.  Unbeknownst to Mr. Kessinger and AmGUARD at the time of Mr. Moore's selection, he was being investigated by the Louisiana Legislative Auditor for his compensation arrangements for his work on behalf of a policyholder (Grant Parish School Board) in a Hurricane Laura claim, which would not be disclosed until February 2024.[62]  The Louisiana Legislative

---

[59]    Rec. Doc. 130-5 at 19 (Depo. Transcript72:22-73:23).

[60]    Rec. Doc. 126-1 at 1, 7, 16.

[61]    (Ex A, Appraisal Agreement and Protocol at p.3).

[62]    Rec. Doc. 95-4 at 2 ("Mr. Moore also appears to have acted as a public adjuster on GPSB's behalf, without having a license to do so; moreover, as a public adjuster, he would be prohibited from

Auditor report writes the following regarding Mr. Moore:

- "Mr. Moore also appears to have acted as a public adjuster on GPSB's behalf, without having a license to do so; moreover, as a public adjuster, he would be prohibited from having any other financial interest in GPSB's insurance claim."[63]

- "It appears Mr. Moore acted as a public adjuster on GPSB's behalf and solicited compensation in connection with GPSB's insurance claim from Cimarron; from Mr. Clay Fowler, the member/manager of prospective contractor, DCF Construction and Supply LLC (DCF); and from a prospective insurance appraiser, Mr. Kevin Hromas."[64]

- Mr. Moore reportedly wrote Mr. Fowler, the member/manager of prospective contractor, DCF Construction confirming Mr. Moore's financial interest in the claim: "I assume my nickel has been included," to which Mr. Fowler responded "Oh most definitely And your 2 cents."[65]

Although Mr. Moore denies these claims, it is undisputed that AmGUARD and its appraiser had no knowledge of these accusations and Mr. Moore's involvement in the Grant Parish School Board claim before agreeing to his selection as umpire.

*Third*, Windsor Village misrepresents to the Court that Mr. Moore carefully considered "both appraisers' positions—evidenced by his significant reductions to Mr. Irwin's estimate."[66] The only work Mr. Moore performed for his $75,000 fee constituted minimal changes to Mr. Irwin's estimate that he described as removing "fluff" that he omits in "every" appraisal estimate.[67] Mr. Moore made those changes *before* receipt of Mr. Kessinger's appraisal position, and he did

---

having any other financial interest in GPSB's insurance claim . . . . If Mr. Moore performed public adjuster services for GPSB without a license and solicited additional compensation from a GPSB contractor and potential contractors, Mr. Moore and others may have violated state and federal law.").

[63]    Rec. Doc. 95-4 at 2.

[64]    *Id.* at 63.

[65]    *Id.* at 68.

[66]    Rec. Doc. 126-1 at 22.

[67]    Rec. Docs. 130-15 at 3, 10; 130-5 at 42 (Depo. Transcript 163:20-164:2), 54 (Depo. Transcript 210:3-5).

not make any further changes to the estimate after receipt of Mr. Kessinger's position.[68] There is

no evidence Mr. Moore reviewed or considered Mr. Kessinger's narrative report, as Mr. Moore did

not produce it in response to AmGUARD's subpoena, and Mr. Moore testified that he first learned

of Mr. Kessinger's disagreements months after Mr. Moore closed the appraisal.[69]

Windsor Village's motion sidesteps the work Mr. Moore performed—and understandably

so. But there is no justification for the minimal effort Mr. Moore undertook on this file, the $75,000

he collected from the parties,[70] or the repeated violations of his obligations under the Appraisal

Protocol and Agreement and the Appraisal Panel Agreement. The appraisal award is unenforceable

because Mr. Moore did not perform the duties required of him.

### III. Feigned Agreements between Mr. Irwin and Mr. Kessinger Are No Excuse for Mr. Moore's Failure to Perform the Duties Required of Him.

To distract from Mr. Moore's refusal to do the work required of him—to decide disputes

between the arbitrators—Windsor Village misstates Mr. Moore's testimony about purported

agreements between the two arbitrators, repeating the following statement in its motion to enforce:

> According to both Mr. Moore and Mr. Irwin, Mr. Kessinger was in
> agreement with the scope of Mr. Irwin's position outside of an
> obvious number transposition error on the pool estimate. This
> included that the roofs required replacement, code upgrades, fencing
> damage, cladding and gutters, and interior damages.[71]

This is false. Mr. Moore testified that he could not recall any agreement by Mr. Kessinger to

include amounts for the decking, cladding, or fencing in his estimate.[72]

Mr. Moore also was unaware of any conversations between Mr. Kessinger and Mr. Irwin

---

68    Rec. Doc. 130-5 at 42-43 (Depo. Transcript 163:20-168:21).

69    *Id*. at 33 (Depo. Transcript 126:8-128:4), 50-51(Depo. Transcript 197:17-198:3).

70    Rec. Doc. 130-5 at 54 (Depo. Transcript 210:3-5).

71    Rec. Doc. 126-1 at 8, 17.

72    Rec. Doc. 130-5 at 39 (Depo. Transcript 151:14-25).

before Mr. Moore was invoked as umpire,[73] what items the two appraisers disputed at the time Mr.

Moore was invoked,[74] the specifics of conversations during the February 21 joint inspection,[75] any

agreement on format,[76] or what "exactly [Mr. Kessinger] said" about the roofs, fencing, interior

damage, or cladding and gutters[77]:

> Q.      Okay. Do you recall any specific language that Dan used about the decking, the cladding, and the fence and whether he would include -- promise to include that in his estimate?
>
> A.      If -- to my recollection, Dan's dialogue about not wanting something or not doing something or agreeing to something was minimal.
>
> Q.      Okay. Again, the question was, do you remember him specifically agreeing or promising to include amounts for the decking, the cladding and the fence in his estimate?
>
> A.      I don't remember that.[78]

If Mr. Moore had bothered to review Mr. Kessinger's position, Mr. Moore would have known that

Mr. Kessinger disagreed with Mr. Irwin's positions on the roof decking, roof framing, fencing,

applicable building codes, and cladding surfaces, as well as the measurements used and numerous

other areas that were supported in detail in Mr. Kessinger's position.[79]  Indeed, Windsor Village's

argument regarding Mr. Kessinger's alleged agreement is nonsensical, because if he agreed to such

damages, then why did Mr. Kessinger request the opportunity to re-inspect those areas after the

February 21 Panel inspection and present his position to Mr. Moore for consideration before

---

[73]     *Id.* at 24-25 (Depo Transcript 93:7-94:24).

[74]     *Id.* at 26 (Depo. Transcript 99:13-21).

[75]     *Id.* at 27 (Depo. Transcript 104:8-21).

[76]     *Id.* at 34 (Depo. Transcript 132:14-18).

[77]     *Id.* at 37-38 (Depo. Transcript 144:8-146:18).

[78]     *Id.* at 39 (Depo. Transcript 151:14-25).

[79]     Rec. Doc. 130-13 at 6, 7, 27.

rendering an award?[80] The answer is clear: because Mr. Kessinger obviously did not agree with Mr. Irwin's position, and wanted Mr. Moore to consider those disagreements before issuance of the award—a task Mr. Moore neglected to perform.

Mr. Moore also assumed conversations occurred that, when pressed, he could not recall.[81] Even worse that assuming facts, Mr. Moore could not testify to whether any overlap existed between Mr. Kessinger and Mr. Irwin's estimates:

> Q.      Do you know if there were any items of overlap between Dan's estimate and Luke's estimates?
>
> . . .
>
> A.      I'm not aware of it.
>
> Q.      Okay. Not aware of any agreements between them?
>
> A.      No.[82]

He could not testify whether any overlap existed because he did not do the work of comparing the two estimates.  Mr. Kessinger's position detailed how the interior allowances Mr. Irwin included were overstated—notwithstanding the fact that Mr. Kessinger himself estimated $128,751.56 in interior damage[83]—Mr. Moore was unaware of the agreement for interior allowances, and therefore his ultimate award erroneously neglected to include the agreed-upon scope of damages.[84]

Mr. Moore refused to do the work and cannot be excused from performance by assuming agreements occurred between Mr. Kessinger and Mr. Irwin—agreements denied by Mr. Kessinger's sworn testimony.

---

[80]      Rec. Doc. 130-16 at 9.

[81]      *E.g.*, *id.* at 40 (Depo. Transcript 157:8-15).

[82]      *Id.* at 39 (Depo. Transcript 152:17-24).

[83]      Rec. Doc. 130-13 at 7.

[84]      *Id.* at 43-44 (Depo. Transcript 169:11-170:21).

IV.   **Windsor Village Cannot Identify Any Case Law that Excuses the Scope and Frequency of Contractual Violations Committed by Mr. Irwin and Mr. Moore.**

Sidestepping behavior that it cannot defend, Windsor Village cites Chief Judge Shelly Dick's opinion in *Cole v. Garrison Prop. & Cas. Ins. Co.* to suggest that Mr. Kessinger's "opportunity to participate" should be afforded weight when evaluating the appraisal award.[85] Nothing about the *Cole* opinion excuses the actions of Mr. Irwin, explains the inactions of Mr. Moore, or lends support to enforcing the appraisal award.  There, the insured appointed Mr. Irwin as her appraiser, but the insurance company's appraiser failed to inspect the property, effectively withdrew, and never provided a position to the umpire.[86]  The question in *Cole* was whether to vacate an appraisal award because the dissenting appraiser (who did not sign the award) failed to perform the duties required of him.[87]  The *Cole* court did not analyze whether Mr. Irwin or the umpire (the two individuals who did sign the award) performed the duties required of them—the question before this Court.[88]  AmGUARD does not seek to vacate the appraisal award because of any lack of opportunity to participate.  The appraisal award is unenforceable because the two signatories to the award, Mr. Irwin and Mr. Moore, failed to perform their duties under the appraisal agreements.  The outcome in *Cole* is inapposite.

V.   **Windsor Village's Complaints About AmGUARD's Appraiser Dan Kessinger Are Not Grounds To Enforce The Award.**

Ignoring the multiple breaches by its own appraiser Mr. Irwin and the umpire Mr. Moore,

---

[85]   *See* Rec. Doc. 126-1 at 16.

[86]   *Cole v. Garrison Prop. & Cas. Ins. Co.,* 3:22-CV-00318, 2023 WL 7092491 at *2-3 (M.D. La. Oct. 26, 2023)

[87]   *Id.* at *3.

[88]   *See id.* at *5-6.

Windsor Village's motion predictably attempts to cast doubt on the credibility of AmGUARD's appraiser, Mr. Kessinger. But Windsor Village's attacks on Mr. Kessinger are factually incorrect—he diligently performed his contractual and statutory duties as an appraiser—and Windsor Village's arguments are legally irrelevant, as they do nothing to show compliance with the parties' Appraisal Agreement and Protocol required to enforce the award.

As an initial matter, Mr. Kessinger did not admit to breaching the Appraisal Agreement and Protocol because his estimate did not include separate estimates for Hurricane Ida and Delta damages. As he explained in his testimony, his position did not delineate any RCV and ACV amounts between Hurricanes Ida and Delta because he found all the observed damages were caused by Hurricane Delta—there was no need to submit separate estimates.[89] But Mr. Irwin made no effort to confer with Mr. Kessinger, and Mr. Moore made no meaningful attempt to engage with Mr. Kessinger or consider his position, and therefore this claimed admission by Mr. Kessinger does nothing to show the award should be enforced.

### A. Mr. Kessinger, Not Mr. Irwin, Complied With The Contract's Requirements To "Meet To Attempt In Good Faith To Resolve Any Disputes or Differences."

Unlike Mr. Irwin, Mr. Kessinger made every effort to meet in good faith to resolve disputes or differences, and to narrow the disputes and differences pursuant to Paragraph (C)(2) of the Appraisal Agreement and Protocol before engaging the umpire. After Mr. Kessinger was appointed on August 3, 2023,[90] he promptly engaged with Mr. Irwin on August 7; because Mr. Irwin had already begun inspecting the property with his 13-person team, Mr. Irwin promised to send materials to Mr. Kessinger so that the appraisers could "focus on conditions, things [Mr.

---

[89]    Rec. Doc. 130-7 at 9 (Depo. Transcript 35:23-36:11).

[90]    *Id.* at 10 (Depo. Transcript 37:23-25).

Irwin] observed" and to avoid "inconvenience" to the Windsor Village residents.[91]  On August 28, Mr. Irwin memorialized this conversation in his own words via e-mail and his promise to send documentation to Mr. Kessinger so that the appraisers could attempt to reach agreements on the loss: "Just as a heads up, we should be getting close to getting all stuff ready to get over to you as well for us to review and then walk the property together."[92]

Due to Mr. Irwin's representations that made it appear he intended to cooperate, Mr. Kessinger repeatedly attempted to contact Mr. Irwin to obtain his promised materials so that the appraisers could meet in good faith to resolve disputes or differences—Mr. Kessinger contacted Mr. Irwin on September 27 (twice) and September 29 via text message—but Mr. Irwin never responded.[93]  Indeed, Mr. Irwin did not even provide Mr. Kessinger with a "point of contact" to allow him to inspect the property, and Mr. Kessinger asked Mr. Irwin for his preferred method of communication, but Mr. Irwin ignored these overtures.[94]  And contrary to Mr. Kessinger's efforts to meet in good faith, Mr. Irwin did nothing to respond or attempt to reach any agreements before he unilaterally invoked the umpire on January 29.[95]

### B. Mr. Irwin's Refusal To Engage With Mr. Kessinger Prevented Him From Reaching Any Agreements Regarding His Preliminary Inspection.

Curiously, Windsor Village's motion attempts to blame Mr. Kessinger for preparing a preliminary estimate following his preliminary inspection on November 16, 2023 and not sharing it with Mr. Irwin,[96] but Windsor Village disregards that, because Mr. Irwin would not respond to

---

[91]    *Id.* at 10 (Depo. Transcript 38:1-39:8), 11 (Depo. Transcript 42:20-43:1).

[92]    Rec. Doc. 126-20 at 34-35.

[93]    Rec. Docs. 130-8 at 15; 130-10 at 2.

[94]    Rec. Doc. 130-10 at 2.

[95]    Rec. Doc. 126-20 at 31-32

[96]    Rec. Doc. 126-1 at 7.

Mr. Kessinger's requests to confer,[97] Mr. Kessinger was forced to request an inspection through counsel and without the benefit of any information regarding Mr. Irwin's position.[98]   Windsor Village omits Mr. Kessinger's clear testimony regarding why he prepared that preliminary estimate and never had the opportunity to share it with Mr. Irwin before Mr. Irwin unilaterally invoked the umpire: "Ultimately I wanted to meet with Luke [Irwin]" but Mr. Irwin got the umpire involved "prior to us even having a disagreement."[99]   Mr. Kessinger explained that, based upon Mr. Irwin's representations, Mr. Kessinger believed "the path forward with this appraisal was that Luke [Irwin] was on site early with his team" and that "he was going to be providing his detailed cost estimate for [Kessinger's] review prior to inspection," but "[t]hat didn't occur."[100]   And because Mr. Irwin had not shared any details regarding his position—which ultimately expanded the scope of the loss by including interior damages and exterior damages (in addition to the roofs)[101]—Mr. Kessinger's preliminary inspection did not cover those areas, and because he was not granted access to the interiors of the property. Windsor Village's complaints regarding Mr. Kessinger's preliminary estimate are also irrelevant because Mr. Irwin never responded to Mr. Kessinger's overtures or asked for his inspection—it never mattered to him because he had no intention of trying to reach any agreements before invoking the umpire on January 29, 2024.[102]

In fact, Windsor Village's arguments highlight exactly how Mr. Irwin breached the Appraisal Agreement and Protocol.  Mr. Irwin completed his full estimate by October 16, 2023,[103]

---

[97]     Rec. Docs. 130-8 at 15; 130-10 at 2.

[98]     Rec. Doc. 130-7 at 10 (Depo. Transcript 40:12-19).

[99]     *Id*. at 12 (Depo. Transcript 47:14-22).

[100]    *Id*. at 12 (Depo. Transcript 46:9-15).

[101]    Rec. Doc. 130-13 at 5.

[102]    Rec. Doc. 126-20 at 31-32.

[103]    Rec. Doc. 130-6 at 6.

but never shared it (after Mr. Kessinger requested it).  When Mr. Irwin did finally share his position

and estimates on February 1 (the date of the Court's deadline for completion of the estimate),[104]

the first available date for the Panel inspect was February 21,[105] which left Mr. Kessinger only six

days to complete his appraisal position, estimate and response to Mr. Irwin's position in order to

comply with the 14-day delay period required under the Appraisal Agreement and Protocol.[106]  It

is clear that Mr. Irwin's delay was intentional, attempting to bait Mr. Kessinger into breaching the

contract.  As a result, counsel for the parties reached an agreement to allow Mr. Kessinger to submit

his position by the week of March 4 (to March 8) following the Panel inspection and the Umpire

to render an award by March 19.[107]

    That extension necessitated by Mr. Irwin's inaction and delays ultimately did not salvage

Mr. Moore's non-compliance with the contract, either; as more fully explained before, Mr. Moore

finalized his estimate a week *before* receiving Mr. Kessinger's position.  The extension also does

not salvage Mr. Irwin's breach of the "14 days" provision on February 1, 2024 or waive

AmGUARD's right to attack the award based on Mr. Irwin's violation of the following provision:

> If either Appraiser fails to provide a document to the opposing
> Appraiser no less than 14 calendar days before presentation to the
> Umpire, the document cannot be utilized as a supporting document
> during the presentation to the Umpire.[108]

This "14 days" term in the parties' contracts is obviously part and parcel of the appraisers' duties

to attempt to reach agreements before invoking the umpire to resolve their differences, and sets a

clear 14-day period for a conferral on any materials before transmission to the umpire.

---

[104]    Rec. Doc. 126-20 at 29-30.

[105]    *Id*. at 27-28.

[106]    (Ex A, Appraisal Agreement and Protocol at ¶ D(3)).

[107]    Rec. Docs. 126-20 at 22-23*;* Rec. Doc. 126-35.

[108]    (Ex A, Appraisal Agreement and Protocol at ¶ D(3)).

Mr. Irwin did not comply with this provision when he unilaterally invoked the umpire on January 29, and sent his entire appraisal position to both Mr. Moore and Mr. Irwin simultaneously on February 1, leaving no time for the appraisers to reach any agreements before Mr. Moore was invoked. Mr. Moore was prohibited from considering these materials because Mr. Irwin did not adhere to the 14-day delay period. Windsor Village selectively highlights in its motion that AmGUARD agreed to extend the time for Mr. Kessinger to submit his position—ignoring that Mr. Irwin's earlier breach of the "14 days" provision caused Mr. Kessinger to need an extension to submit his position—AmGUARD never agreed to waive the 14-day requirement that Mr. Irwin had already breached. Because Mr. Irwin plainly breached the "14 days" provision, his appraisal position—which formed the basis of the award—was improperly considered by Mr. Moore. The appraisal award must be vacated.

### C.  Mr. Kessinger's Efforts To Obtain Bids To Support His Estimate Did Not Violate The Parties' Contract.

Windsor Village also complains that Mr. Kessinger obtained "deliberately low construction bids to try and cheat the appraisal process."[109] But there is nothing wrong with Mr. Kessinger's efforts to source construction bids to support his view of the appropriate cost to repair Windsor Village's damage; there is no Louisiana law prohibiting an umpire from considering bids in resolving differences between the appraisers, and the parties contract does not prohibit it or any of the other accusations lodged by Windsor Village. The live bids sought by Mr. Kessinger are highly relevant, too, to determine the "amount of loss" based on "the RCV and ACV of the cost to repair … direct physical loss of or damage" to the property required under the Appraisal Agreement and Protocol.[110] Mr. Kessinger was free to obtain bids and Mr. Moore was free to consider them—but

---

[109]    Rec. Doc. 126-1 at 2.

[110]    (Ex A, Appraisal Agreement and Protocol at p. 3 ¶ A(1-2)).

Mr. Moore had already finalized his estimate 8 days before he ever received Mr. Kessinger's position supported by a live bid by Coleman.[111]   Windsor Village's complaints regarding Mr. Kessinger's efforts to obtain a live bid from Sunrise Construction are wholly irrelevant, as Mr. Kessinger did not present any estimate from Sunrise Construction in his position paper.

Mr. Kessinger obtained a live bid from Coleman to perform the scope of repairs he found to make necessary repairs to "direct physical loss of or damage,"[112] caused by Hurricane Delta, and presented it to Mr. Moore because it supported his view that the appropriate repairs did not cost the $11.7 million presented by Mr. Irwin. Windsor Village unsurprisingly seeks to discredit Coleman's estimate because it shows Mr. Irwin's astronomical estimate is not realistic—and that the market price for required work is a fraction of Mr. Irwin's estimate.

Windsor Village is wrong that Mr. Kessinger intentionally limited the scope of repairs that he provided to Coleman, too.  Mr. Kessinger did not include any decking repairs because they are unnecessary—Windsor Village's own retained engineer Gurtler Brothers opined that the decking conditions were not caused by either Hurricane, finding construction defects in numerous attics.[113] Mr. Kessinger agreed, and did not find that replacing all of the roofs decking and framing was necessary to repair damage caused by "direct physical loss of or damage" to the property as required under the Appraisal Agreement and Protocol.[114]   And there is nothing nefarious about the solicitation of the Coleman bid, as Mr. Kessinger explained at deposition, the Coleman representative that provided the bid was a "Commercial Division Manager" and Mr. Kessinger had

---

[111]     Rec. Docs. 130-15 at 10; 130-13 at 11.

[112]     (Ex A, Appraisal Agreement and Protocol at p. 3 ¶ A(2)).

[113]     Rec. Doc. 130-15 at 17.

[114]     Rec. Doc. 130-15 at 16.

no reason to doubt his qualifications.[115]  Mr. Yancey's after-the-fact opinions in his affidavit attempting to walk back the estimate are inadmissible—he is not an expert, and do not show Mr. Kessinger's solicitation of that bid and presentation of the bid to Mr. Moore was improper.[116]  Mr. Moore was free to evaluate the bid on his own and weigh the credibility of Coleman's bid to resolve the discrepancy between the appraisers, but ultimately, there is no evidence Mr. Moore considered anything in Mr. Kessinger's position, because Mr. Moore virtually finished his estimate 8 days before he received the live bid from Coleman contained in Mr. Kessinger's position.[117] Ultimately, Mr. Kessinger's position made no difference to the outcome of this appraisal because Mr. Moore never considered it.

## VI.    <u>Remanding The Dispute To Appraisal To Address The Errors Is Not Appropriate.</u>

Remand is not appropriate under the circumstances.  Fifth Circuit jurisprudence cautions against remand where "an appraisal is vacated for fraud or another reason casting doubt on the basic competency of the appraisers."[118]  Mr. Irwin's gamesmanship, Mr. Moore's disregard of his contractual obligations, and the undisputed contractual breaches confirm that the appraisal award cannot be corrected by this Panel.

Although the parties agreed to appraisal to seek a resolution of this claim, Windsor Village used the appraisal to expand the parties' dispute and relies on Mr. Irwin's $11,720,980.01 estimate, over *triple* the amount of Windsor Village's highest litigation estimate.[119]  Mr. Irwin's inflated estimate did not just move the goalpost and impede the resolution of this claim through appraisal;

---

[115]    Rec. Docs. 126-28; 130-7 at 23 (Depo. Transcript 90:16-91:8).

[116]    Rec. Doc. 126-29.

[117]    Rec. Doc. 130-15 at 10

[118]    *St. Charles Par. Hosp. Serv. Dist. No. 1 v. United Fire & Cas. Co.*, 681 F. Supp. 2d 748, 765 (E.D. La. 2010)

[119]    Rec. Doc. 130-11 at 289.

he employed an "appraisal by ambush" tactic that Mr. Irwin himself described as "inappropriate[]"whereby he refused to share information with AmGUARD's appraiser (Dan Kessinger),[120] did not attempt to reach any agreements regarding the loss,[121] and ambushed Mr. Kessinger and the umpire Mr. Moore with hundreds of pages of materials on the eve the Court's deadline for completion of the appraisal.  Remanding the appraisal award back to Mr. Irwin and Mr. Moore would not cure these improprieties.  This is not the case where a small error has occurred that could be rectified by re-opening the Panel; Mr. Irwin and Mr. Moore gravely deviated from their statutory and contractual duties, demonstrated bias, and therefore remanding this claim back to appraisal would be futile.

## **CONCLUSION**

Mr. Moore and Mr. Irwin derogated from their contractual and statutory duties to render a fair, impartial, and accurate appraisal award.  The violations of the parties' agreement, clear errors in the award, and bias each warrants the denial of Windsor Village's motion to enforce the award. This Court should vacate the award and proceed to trial on the merits.


[Signature page follows]

---

[120]     Rec. Doc. 130-3 at 19-20 (Depo. Transcript 73:19-74:12), 46 (Depo. Transcript 178:12-179:20), 49-50 (Depo. Transcript 193:6-194:10).

[121]     *Id*. at 65 (Depo. Transcript 256:14-257:10).

Respectfully submitted,

*/s/  Laurence D. LeSueur, Jr.*
John W. Joyce, 27525
Laurence D. LeSueur, Jr., 35206, T.A.
Lance W. Waters, 37351
BARRASSO USDIN KUPPERMAN
  FREEMAN & SARVER, L.L.C.
909 Poydras Street, Suite 2350
New Orleans, Louisiana  70112
Telephone:  504/589-9700
Facsimile:  504/589-9701
jjoyce@barrassousdin.com
llesueur@barrassousdin.com
lwaters@barrassousdin.com

*Attorneys for AmGUARD Insurance*
*Company*