**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| WINDSOR VILLAGE CONDOMINIUM | * | CIVIL ACTION NO: |
| OWNER'S ASSOCIATION | * | 3:21-cv-00468-BAJ-SDJ |
| | * | |
| VERSUS | * | JUDGE BRIAN A. JACKSON |
| | * | |
| BERKSHIRE HATHAWAY GUARD | * | MAGISTRATE JUDGE |
| INSURANCE COMPANY and AMGUARD | * | SCOTT D. JOHNSON |
| INSURANCE COMPANY | | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**DEFENDANT AMGUARD INSURANCE COMPANY'S REPLY MEMORANDUM**
**IN SUPPORT OF ITS MOTION TO VACATE APPRAISAL AWARD**

Windsor Village concedes that an appraisal award is only enforceable if the appraisers performed the duties required of them.[1] But when offered the opportunity to show that its appraiser Luke Irwin or the umpire Joel Moore strictly adhered to the appraisal agreement, Windsor Village declined that opportunity—and for good reason. The actions of Mr. Irwin and the inaction of Mr. Moore violated the appraisal agreement. The opposition also fails to contest facts underlying AmGUARD's motion to vacate, including that:

- Mr. Irwin never attempted to resolve any differences before invoking Mr. Moore;[2]
- The only changes Mr. Moore made to Mr. Irwin's estimate occurred before Mr. Moore received the position of AmGUARD's appraiser, Dan Kessinger;[3]
- Mr. Moore did not consider Mr. Kessinger's appraisal position;[4] and
- The umpire's award does not match his own Xactimate estimate.[5]

To sidestep the multiple violations that the umpire and Windsor Village's appraiser committed, the

---

[1] Rec. Doc. 140 at 13 ("An appraisal award issued under an insurance policy is binding if the appraisers have performed the duties required of them by the policy and/or the contract between the parties.").

[2] *See id.* at 14-15.

[3] *See id.* at 12, 18, 20.

[4] *Compare id.* at 20-22, *with* Rec. Doc. 130-5 at 33-35, 42-43 (J. Moore Depo. Transcript 127:12-128:4; 133:17-135:5; 163:20-164:23; 168:3-7).

[5] Rec. Doc. 140 at 23-23 ("The Appraisal Award and the Final Appraisal Estimate involve overlapping scopes such that they aren't supposed to match category for category.").

1

opposition argues that: (a) Mr. Kessinger violated the appraisal agreement;[6] (b) Mr. Irwin did not breach the agreement because the Panel participated in a February 21, 2024 joint inspection, the parties extended the timeline to consider Mr. Kessinger's position, and AmGUARD did not assert contemporaneous objections to Mr. Irwin's misconduct;[7] and (c) Mr. Moore had no obligation to consider Mr. Kessinger's position.[8] Each of Windsor Village's arguments misses the mark.

*First*, AmGUARD is not moving to vacate the appraisal award because of Mr. Kessinger—rather because Mr. Irwin and Mr. Moore failed to perform the duties required of them. The opposition's urgency to shift attention away from the two individuals that signed a $9.5 million award is telling. *Second*, Windsor Village has offered the Court no legal authority to suggest that its complaints about Mr. Kessinger, a subsequent joint inspection, or deadline extensions absolve Mr. Irwin of the legal consequences of breaching the appraisal agreement.[9] *Third*, AmGUARD did not consent to Mr. Irwin's ambush tactics. *Lastly*, whether an umpire considers an appraiser's position is relevant under Louisiana law.[10] Mr. Moore's refusal to review Mr. Kessinger's materials demonstrates this appraisal was tainted by partiality and justifies vacatur.[11]

Windsor Village also falsely accuses AmGUARD of misrepresenting facts (without offering any specifics) and defaming unidentified "third-parties."[12] Its frustration with the facts

---

[6]  *Id.* at 17-18.

[7]  *Id.* at 1-2.

[8]  *Id.* at 18-20.

[9]  AmGUARD is not challenging the appraisal award "because of the conduct of its own appraiser." *St. Charles Par. Hosp. Serv. Dist. No. 1 v. United Fire & Cas. Co.*, 681 F. Supp. 2d 748, 765 (E.D. La. 2010). The breaches, bias, and errors raised in AmGUARD's motion were committed by Mr. Irwin and Mr. Moore alone.

[10]  *St. Charles Par. Hosp. Serv. Dist. No. 1*, 681 F. Supp. 2d at 756 ("It is not an admission that the process was tainted by partiality. The circumstances might be much different if an appraiser and umpire actually excluded the other appraiser from any discussions, or if an umpire declined to review one of the appraisers' materials altogether. This is not the situation here.").

[11]  *Id.*

[12]  Rec. Doc. 140 at 1, 3, 14, 21.

2

uncovered in discovery is no basis to accuse AmGUARD of misrepresentation. Mr. Moore's Xactimate data, Mr. Irwin's time-keeping (billing 390 hours for inspections when Windsor Village's prior estimate writer Barry Runk spent 6 hours at the property);[13] the $650,000 Irwin invoice (based on $350/hour rates for his entire staff), and Louisiana's Legislative Auditor investigation into Mr. Moore illustrate that AmGUARD's motion to vacate is not a disagreement over the amount awarded—but a dispute over Mr. Moore and Mr. Irwin's failure to perform their contractual and statutory duties to render a fair, impartial, and accurate appraisal award.

I. **Windsor Village Does Not and Cannot Defend Mr. Irwin's Refusal to Attempt to Resolve Disputes with Mr. Kessinger Before Invoking Mr. Moore.**

There is no dispute that Mr. Irwin failed to confer with Mr. Kessinger before Mr. Irwin invoked the umpire on January 29, 2024 and sent his position to both Mr. Moore and Mr. Kessinger on February 1, 2024.[14] Windsor Village's briefing contains a five-month gap when narrating Mr. Irwin's actions—conveniently fast forwarding from August 7-9, 2023 (Mr. Irwin's property inspections) to February 1, 2024 (mailing Mr. Irwin's position to Mr. Moore and Mr. Kessinger).[15] The opposition also fails to address Mr. Irwin's ambush tactics detailed at length in AmGUARD's motion to vacate, including: (a) Mr. Irwin's misleading August 28, 2023 email to Mr. Kessinger, (b) Mr. Irwin ignoring Mr. Kessinger's requests in September 2023 for a "point of contact" and "preferred method of communication;" and (c) Mr. Irwin waiting until January 28, 2024 to begin drafting his position paper (after billing 554 hours on the file between August-October 2023).

Unable to justify Mr. Irwin's refusal to confer with Mr. Kessinger and ignoring a five-month period between August 2023 and February 2024, Windsor Village's opposition scours the

---

[13]    *Compare* (Exhibit A, Excerpts from B. Runk Depo. at 39:6-40:6, 45:3-46:11, 55:2-56:10; 67:1-68:1); Rec. Doc. 21-3 (B. Runk Estimate); *with* Rec. Doc. 130-6 at 1-4.

[14]    *See id.* at 14-15.

[15]    *Id.* at 4-5.

3

timeline *after February 1, 2024* for anything to downplay Mr. Irwin's breaches of the appraisal agreement on January 29, 2024 and February 1, 2024. ***First***, Windsor Village highlights that Mr. Irwin conferred with Mr. Kessinger during a February 21, 2024 joint inspection: "[T]he facts show both appraisers conferred in the presence of the umpire before any positions were reviewed."[16] But the appraisal agreement required the appraisers to confer before invoking the umpire, and the joint inspection occurred weeks after Mr. Irwin unilaterally invoked the umpire.[17] The agreement provides no exception for prematurely invoking the umpire simply because the umpire is slow to review materials or because the appraisers later conferred in the presence of the umpire.[18]

***Second***, the opposition cites the following provision of the appraisal agreement and protocol in an effort to justify Mr. Irwin's unilateral invocation and failure to confer with Mr. Kessinger before February 2024:

> If the Appraisers do not agree on the amount of the loss within ninety (90) days of their appointment they shall notify the Parties who may by written agreements allow one or more extensions of time for the Appraisers to reach agreement. If the Parties do not agree regarding an extension of time then the Appraisers' disputes and differences shall be submitted to the Umpire.[19]

However, according to plaintiff, Windsor Village appointed Mr. Irwin on June 21, 2023, AmGUARD appointed Mr. Kessinger on August 1, 2023, 90 days from the August 1, 2023 appointment is October 30, 2023, and the parties repeatedly agreed to extend appraisal deadlines.[20] Both AmGUARD and the Court are left to guess how the 90-day provision in the appraisal

---

[16]   Rec. Doc. 140 at 2, 15.

[17]   Rec. Doc. 130-2 at 4 (Appraisal Agreement and Protocol at p. 4 ¶ C(2)) ("The Appraisers shall meet to attempt in good faith to resolve any disputes or differences and to narrow the disputes and differences that must be addressed in the proceedings before the Umpire. If they agree, such agreement shall be noted as the result of the appraisal on that issue.").

[18]   *Id.*

[19]   *Compare* Rec. Doc. 130-2 at 4, *with* Rec. Doc. 140 at 4, 14.

[20]   Rec. Doc. 140 at 4-5.

4

agreement excuses Mr. Irwin's unilateral invocation and failure to confer before February 2024.

***Third***, Windsor Village also adopts a "no harm, no foul" approach to Mr. Irwin's unilaterally invocation by blaming the mail: "Mr. Irwin also attempted to mail Mr. Moore a copy of this thumb drive [on February 1, 2024] but it was not delivered."[21] The opposition advances the following contested timeline: (a) the February 1, 2024 thumb drive did not reach Mr. Moore; (b) the appraisers conferred during the February 21, 2024 joint inspection; (c) the appraisers reached agreements; and (d) Mr. Irwin resent his position to Mr. Moore on February 22, 2024.[22] Even if this Court were to accept as true this narrative of a lost thumb drive and purported agreements, Mr. Irwin still would have breached the appraisal agreement on February 22, 2024.

During his deposition, Mr. Irwin testified that he resent his entire appraisal position to Mr. Moore via a thumb drive on February 22, 2024.[23] But the appraisal agreement provides that only differences are to be submitted to the umpire.[24] If the appraisers had purportedly reached agreements, Mr. Moore violated the appraisal agreement by sending his entire position to Mr. Moore on February 22, 2024 without narrowing the submission to the appraisers' disagreements. If no effort was made to narrow their disagreements, Mr. Moore violated the appraisal agreement by sending his entire position to Mr. Moore on February 22, 2024 without conferring.[25]

The date Mr. Moore received the thumb drive is irrelevant: Mr. Irwin breached the agreement by forwarding his entire position (on February 1, 2024 and February 22, 2024). At the same time, Mr. Moore incorrectly *assumed* the appraisers had met and conferred. Mr. Moore also

---

[21]    *Id.* at 5.

[22]    *Id.* at 5-6.

[23]    Rec. Doc. 130-3 at 81-82 (L. Irwin Depo. Transcript at 321:13-322:14).

[24]    Rec. Doc. 130-2 at 5 (Appraisal Agreement and Protocol at p. 5 ¶¶ D(2)-(4)).

[25]    *Id.* at 4 (Appraisal Agreement and Protocol at p. 4 ¶ C(2)).

5

assumed they agreed on certain issues (such as the appropriate measurements) when he received Mr. Irwin's position.[26] Mr. Moore's assumption was flawed, ignored the appraisal agreement, and carried serious consequences.

## II. The *Cole v. Garrison Property and Casualty Insurance Co.* Does Not Excuse Mr. Moore's Refusal to Consider Mr. Kessinger's Appraisal Position.

Windsor Village also cites Chief Judge Shelly Dick's opinion in *Cole v. Garrison Property and Casualty Insurance Co.* for the proposition that "whether the umpire considered one appraiser's position or not is irrelevant once the award has been signed."[27] Nothing about the *Cole* opinion explains the inactions of Mr. Moore or lends support to the proposition that an umpire may refuse to consider the position of an appraiser who participated in the appraisal process.

The insured in *Cole* appointed Mr. Irwin as her appraiser, but the insurer's appraiser failed to inspect the property, effectively withdrew, and never provided a position to the umpire.[28] There, the question was whether to vacate an appraisal award because the dissenting appraiser (who did not sign the award) failed to perform the duties required of him.[29] The *Cole* court did not analyze whether Mr. Irwin or the umpire (the two individuals who signed the award) performed the duties required of them—the question before this Court.[30] Nowhere in the *Cole* decision does the Court address whether an umpire can ignore material submitted by an appraiser who participated in the process. An Eastern District of Louisiana opinion, cited extensively by Chief Judge Dick in the *Cole* decision,[31] does touch on an appraisal's refusal to consider a position.

---

[26]     *See, e.g.*, Rec. Doc. 130-5 at 19 (J. Moore Depo. Transcript 70:16-71:21).

[27]     Rec. 140 at 19; *accord* Rec. Doc. 140 at 2 ("[T]his Court has already rejected the idea that an umpire's failure to consider a position is grounds for vacatur.").

[28]     *Cole v. Garrison Prop. & Cas. Ins. Co.,* 22-00318, 2023 WL 7092491 at *2-3 (M.D. La. Oct. 26, 2023).

[29]     *Id.* at *3.

[30]     *See id.* at **5-6.

[31]     *Id.* at *4.

6

There, in *St. Charles Parish Hospital Service Dist. No. 1 v. United Fire and Casualty Co.*, Judge Sarah Vance distinguished between an appraiser being excluded during a final discussion and an umpire's refusal to consider the appraiser's material altogether:

> [T]he deposition testimony provides ample, impartial reasons why [carrier's appraiser] Provencher was not included in the final discussions . . . . It is not an admission that the process was tainted by partiality.
>
> The circumstances might be much different if an appraiser and umpire actually excluded the other appraiser from any discussions, or ***if an umpire declined to review one of the appraisers' materials altogether***. This is not the situation here.[32]

The umpire's refusal to review an appraiser's materials altogether is precisely what occurred here. Mr. Moore refused to "make a determination" about the appraisers' differences:[33] "Resolving disagreements between the parties' appraisers is the entire purpose of the umpire's involvement."[34]

The only work Mr. Moore performed for his $75,000 fee constituted minimal changes to Mr. Irwin's estimate that he described as removing "fluff" that he omits in "every" appraisal estimate.[35] The lowering of overhead and profit that Windsor Village trumpets in its opposition does not show that Mr. Moore "thoroughly reviewed both appraisers' input."[36] The opposition does not dispute that Mr. Moore made those changes before receiving Mr. Kessinger's appraisal position or that Mr. Moore did not make any further changes to the estimate after receipt of Mr.

---

[32] *St. Charles Par. Hosp. Serv. Dist. No. 1*, 681 F. Supp. 2d at 756 (emphasis added).

[33] Rec. Doc. 130-2 at 5 (Appraisal Agreement and Protocol at p. 5 ¶D(4)).

[34] *Spann v. S. Fid. Ins. Co.*, No. 13-6134, 2014 WL 4443527, at *1 (E.D. La. Sept. 9, 2014) ("Resolving disagreements between the parties' appraisers is 'the entire purpose of the umpire's involvement in the process,' and is not in and of itself evidence of bias or impartiality.").

[35] Rec. Doc. 130-15 at 3, 10; Rec. Doc. 130-5 at 42 (Depo. Transcript 163:20-164:2), 54 (Depo. Transcript 210:3-5).

[36] Rec. Doc. 140 at 2.

Kessinger's position.[37]  Repeating self-serving statements Mr. Moore made in his emails and Windsor Village's belittling of "time stamps of a computer program"[38] falls short of mustering any evidence that Mr. Moore reviewed or considered Mr. Kessinger's narrative report.[39]

### III. Feigned Agreements between Mr. Irwin and Mr. Kessinger Are No Excuse for Mr. Moore's Failure to Perform the Duties Required of Him.

To distract from Mr. Moore's refusal to do the work required of him—to decide disputes between the arbitrators—Windsor Village misstates Mr. Moore's testimony about purported agreements between the two arbitrators, repeating the following statement in opposition:

> According to both Mr. Moore and Mr. Irwin, Mr. Kessinger was in agreement with the scope of Mr. Irwin's position outside of an obvious number transposition error on the pool estimate. This included that the roofs required replacement, code upgrades, fencing damage, cladding and gutters, and interior damages.[40]

This is false. Mr. Moore testified that he could not recall any agreement by Mr. Kessinger to include amounts for the decking, cladding, or fencing in his estimate.[41]

Mr. Moore also was unaware of any conversations between Mr. Kessinger and Mr. Irwin before Mr. Moore was invoked as umpire,[42] what items the two appraisers disputed at the time Mr. Moore was invoked,[43] the specifics of conversations during the February 21 joint inspection,[44] any agreement on format,[45] or what "exactly [Mr. Kessinger] said" about the roofs, fencing, interior

---

[37] *Compare id.* at 20-22, *with* Rec. Doc. 130-5 at 33-35, 42-43 (J. Moore Depo. Transcript 127:12-128:4; 133:17-135:5; 163:20-164:23; 168:3-7).

[38] Rec. Doc. 140 at 20-21, 27.

[39] *Id*. at 33 (Depo. Transcript 126:8-128:4), 50-51(Depo. Transcript 197:17-198:3).

[40] Rec. Doc. 126-1 at 6, 15.

[41] Rec. Doc. 130-5 at 39 (J. Moore Depo. Transcript 151:14-25).

[42] *Id.* at 24-25 (Depo Transcript 93:7-94:24).

[43] *Id.* at 26 (Depo. Transcript 99:13-21).

[44] *Id.* at 27 (Depo. Transcript 104:8-21).

[45] *Id.* at 34 (Depo. Transcript 132:14-18).

damage, or cladding and gutters[46]:

> Q. Okay. Again, the question was, do you remember him specifically agreeing or promising to include amounts for the decking, the cladding and the fence in his estimate?
>
> A. I don't remember that.[47]

If Mr. Moore had bothered to review Mr. Kessinger's position, Mr. Moore would have known that Mr. Kessinger disagreed with Mr. Irwin's positions on the roof decking, roof framing, fencing, applicable building codes, and cladding surfaces, as well as the measurements used and numerous other areas that were supported in detail in Mr. Kessinger's 46-page position.[48]

Indeed, Windsor Village's argument regarding Mr. Kessinger's alleged agreement is nonsensical, because if he agreed to such damages, then why did Mr. Kessinger request the opportunity to re-inspect those areas after the February 21, 2024 joint inspection and present his position to Mr. Moore for consideration before rendering an award?[49] The answer is clear: because Mr. Kessinger obviously did not agree with Mr. Irwin's position, and wanted Mr. Moore to consider those disagreements before issuance of the award—a task Mr. Moore neglected to perform.

### IV. AmGUARD Did Not Consent to Mr. Irwin's Gamesmanship and Ambush Tactics.

In its opposition, Windsor Village stresses that AmGUARD never previously "objected to the process or accused anyone of misconduct."[50] But the appraisal agreement prohibited the parties from engaging in *ex parte* communication with the Panel.[51] Consequently, AmGUARD and Windsor Village were frequently not copied on emails between the appraisers and among the

---

[46] *Id.* at 37-38 (Depo. Transcript 144:8-146:18).

[47] *Id.* at 39 (Depo. Transcript 151:21-25).

[48] Rec. Doc. 130-13 at 6, 7, 27.

[49] Rec. Doc. 130-16 at 9.

[50] Rec. Doc. 140 at 1-2.

[51] Rec. Doc. 130-2 at 2 (Appraisal Agreement and Protocol at p. 2 ¶ 15).

9

Panel—including the email when Mr. Irwin invoked the umpire on January 29, 2024 and sent his position to both Mr. Moore and Mr. Kessinger on February 1, 2024. AmGUARD did not consent to Mr. Irwin's misconduct and cannot be faulted by not objecting contemporaneously.

### V.  Mr. Kessinger's Efforts To Obtain Bids Did Not Violate The Parties' Contract.

Relying on an affidavit by Chris Yancey (owner of Coleman Roofing), Windsor Village complains that Mr. Kessinger obtained a low bid from Coleman Roofing to "cheat the appraisal process." There is nothing wrong with Mr. Kessinger's efforts to source construction bids. Neither the appraisal agreement nor Louisiana law prohibits an umpire from considering bids in resolving differences between the appraisers. Mr. Yancey's testimony is also inadmissible hearsay and lacks sufficient personal knowledge. Rules 602 and 701 of the Federal Rules of Evidence require personal knowledge to admit a witness's testimony or opinion.[52] Mr. Yancey's affidavit discusses conversations to which Mr. Yancey was not a party, appears to parrot David Lamonte's recollection of communication between Mr. Kessinger's colleague and Mr. Lamonte, and suggests that Mr. Irwin (not Mr. Kessinger) manipulated the process by asking Coleman to disavow its own bid.[53] Mr. Yancey's affidavit is inadmissible and irrelevant to the propriety of the award.

### CONCLUSION

Mr. Moore and Mr. Irwin derogated from their contractual and statutory duties. The violations of the parties' agreement, clear errors in the award, and bias warrant vacating the award.

Respectfully submitted,

*/s/ Laurence D. LeSueur, Jr.*
John W. Joyce, 27525
Laurence D. LeSueur, Jr., 35206, T.A.
Lance W. Waters, 37351
BARRASSO USDIN KUPPERMAN

---

[52]  Fed. R. Evid. 602; *see* Fed. R. Evid. 701.

[53]  Rec. Doc. 126-29 at 1-2.

                                            FREEMAN & SARVER, L.L.C.
909 Poydras Street, Suite 2350
New Orleans, Louisiana 70112
Telephone: 504/589-9700
Facsimile: 504/589-9701
jjoyce@barrassousdin.com
llesueur@barrassousdin.com
lwaters@barrassousdin.com

*Attorneys for AmGUARD Insurance Company*